SECRETARY OF LABOR, UNITED STATES DEPARTMENT OF LABOR, Plaintiff–Appellee,

v.

Michael LAURITZEN and Marilyn Lauritzen, individually and doing business as Lauritzen Farms, Defendants–Appellants.

No. 86–2770.

United States Court of Appeals, Seventh Circuit.

Argued May 27, 1987.

Decided Dec. 15, 1987.

Rehearing and Rehearing En Banc Denied Feb. 8, 1988.

---

Richard M. Van Orden, Grand Rapids, Mich., for defendants-appellants.

Paula Wright Coleman, Office of the Solicitor, U.S. Dept. of Labor, Washington, D.C., for plaintiff-appellee.

Before WOOD, FLAUM, and EASTERBROOK, Circuit Judges.

HARLINGTON WOOD, Jr., Circuit Judge.

This, as unlikely as it may at first seem, is a federal pickle case. The issue is whether the migrant workers who harvest the pickle crop of defendant Lauritzen Farms, in effect defendant Michael Lauritzen, are employees for purposes of the Fair Labor Standards Act of 1938 ("FLSA"),[1] or are instead independent contractors not subject to the requirements of the Act.[2] The Secretary, alleging that the migrant harvesters are employees, not independent contractors, brought this action seeking to enjoin the defendants from violating the minimum wage requirements and to en-

1. 29 U.S.C. § 201 *et seq.*

2. All the parties refer to the crop to be harvested as the "pickle crop," and so shall we. Perhaps the defendants have developed a remarkable new "pickle" seed. But whether they grow pickles or only potential pickles in the form of cucumbers, the law is the same.

force the record-keeping and child labor provisions of the Act.

After discovery, which entailed principally collecting depositions of migrant workers who had worked for the defendants, the Secretary moved for partial summary judgment. The defendants countered with affidavits of some of the previously deposed migrant workers which contradicted their earlier depositions. The contradictions were charged to language interpretation difficulties and to the absence of defendants' counsel when the depositions were taken.[3] The district court granted the Secretary partial summary judgment, determining the migrants to be employees, not independent contractors. *Brock v. Lauritzen*, 624 F.Supp. 966, 970 (E.D.Wis.1985) (*Lauritzen I*). Trial was then set to determine the remaining issues of possible minimum wage violations, child labor violations, and the sufficiency of the defendants' statutorily required record keeping. By an amended complaint, however, the minimum wage violation allegations were eliminated. The Secretary then sought summary judgment on the remainder of the case. Some migrant workers sought unsuccessfully to intervene to protect their claimed contractual status. The defendants protested that they had raised material factual issues, but the district court disagreed. The district court found that the controlling material facts were largely undisputed and entered final judgment on the issues of record-keeping and child labor violations, enjoining the defendants from further violations of the Act, and dismissing the action. *Brock v. Lauritzen*, 649 F.Supp. 16, 18–19 (E.D.Wis.1986) (*Lauritzen II*). Both summary judgment orders are appealed as well as the district court's denial of the defendants' motion under Federal Rule of Civil Procedure 60(b)(6), seeking relief from the first entry of partial summary judgment.

## I. FACTUAL BACKGROUND

We must examine the factual background of the case to determine whether the employment status of the migrant workers could be concluded as a matter of law.

On a yearly basis the defendants plant between 100 to 330 acres of pickles on land they either own or lease. The harvested crop is sold to various processors in the area. The pickles are handpicked, usually from July through September, by migrant families from out of state. Sometimes the children, some under twelve years of age, work in some capacity in the fields alongside their parents. Many of the migrant families return each harvest season by arrangement with the defendants, but, each year, other migrant families often come for the first time from Florida, Texas and elsewhere looking for work. The defendants would inform the families, either orally or sometimes in writing, of the amount of compensation they were to receive. Compensation is set by the defendants at one-half of the proceeds the defendants realize on the sale of the pickles that the migrants harvest on a family basis. Toward the end of the harvest season, when the crop is less abundant and, therefore, less profitable, the defendants offer the migrants a bonus to encourage them to stay to complete the harvest, but some leave anyway.

Wisconsin law requires a form "Migrant Work Agreement" to be signed, and it was used in this case. It provides for the same pay scale as is paid by the defendants except the minimum wage is guaranteed. The Wisconsin Migrant Law invalidates agreements that endeavor to convert migrant workers from employees to independent contractors. Wis.Stat.Ann. § 103.90–.97 (West 1987); 71 Op. Att'y Gen. Wis. 92 (1982). Accompanying the work agreement is a pickle price list purporting to set forth what the processors will pay the defendants for pickles of various grades. This price list is the basis of the migrant workers' compensation. The workers are not parties to the determination of prices agreed upon between the defendants and the processors.

3. The absence of defendants' counsel at the depositions was the fault of the defendants or of their counsel, who was later replaced. The government, however, gave the usual notice to take the depositions in Texas where the migrant workers were then located.

All matters relating to planting, fertilizing, insecticide spraying, and irrigation of the crop are within the defendants' direction, and performed by workers other than the migrant workers here involved. Occasionally a migrant who has worked for the defendant previously and knows the harvesting will suggest the need for irrigation. In order to conduct their pickle-raising business, the defendants have made a considerable investment in land, buildings, equipment, and supplies. The defendants provide the migrants free housing which the defendants assign, but with regard for any preference the migrant families may have. The defendants also supply migrants with the equipment they need for their work. The migrants need supply only work gloves for themselves.

The harvest area is subdivided into migrant family plots. The defendants make the allocation after the migrant families inform them how much acreage the family can harvest. Much depends on which areas are ready to harvest, and when a particular migrant family may arrive ready to work. The family, not the defendants, determines which family members will pick the pickles. If a family arrives before the harvest begins, the defendants may, nevertheless, provide them with housing. A few may be given some interim duties or be permitted to work temporarily for other farmers. When the pickles are ready to pick, however, the migrant family's attention must be devoted only to their particular pickle plot.

The pickles that are ready to harvest must be picked regularly and completely before they grow too large and lose value when classified. The defendants give the workers pails in which to put the picked pickles. When the pails are filled by the pickers the pails are dumped into the defendants' sacks. At the end of the harvest day a family member will use one of defendants' trucks to haul the day's pick to one of defendants' grading stations or sorting sheds. After the pickles are graded the defendants give the migrant family member a receipt showing pickle grade and weight. The income of the individual families is not always equal. That is due, to

some extent, to the ability of the migrant family to judge the pickles' size, color, and freshness so as to achieve pickles of better grade and higher value.

The workers describe their work generally as just "pulling the pickles off." It is not always physically easy, however, because the work involves stooping and kneeling and constant use of the hands, often under a hot sun. Picking pickles requires little or no prior training or experience; a short demonstration will suffice. One migrant worker recalled that when he was ten years old it had taken him about five minutes to learn pickle picking. Pickles continue to grow and develop until picked, but not uniformly, so harvesting is a continuing process. The migrant workers' income depends on the results of the particular family's efforts. The defendants explain that the migrants exercise care for both the plants and the pickles, which results in maximum yields, a benefit to the family as well as to the defendants. Machine harvesting, although advantageous for other crops, is not suitable for pickle harvesting. The defendants leave the when and how to pick to the families under this incentive arrangement. The defendants occasionally visit the fields to check on the families, the crop, and to supervise irrigation. The defendant, Michael Lauritzen, who actually operates the business, is sometimes referred to as the "boss." Some workers expressed the belief that he had the right to fire them.

The district court considered the factual background generally set forth above to be largely undisputed. *Lauritzen I*, 624 F.Supp. at 966. The defendants deny that some of the facts are undisputed because some of the migrants subsequently changed their testimony. They argue that some migrants had language problems which caused them to respond incorrectly during their depositions. To support this argument, the defendants presented counteraffidavits from four migrants which allege in conclusory language that their relationship with the defendants had been at all times "that of an independent businessman or contractor and not one of an employee."

They "contracted," they say, with the defendants. In other respects these later counteraffidavits did not dispute the basic factual background that we have recounted, except that these four migrants claimed that their pickle-picking expertise required at least a complete harvest to develop. The conclusions set forth in the affidavit, obviously in the language of a lawyer, not that of the migrants themselves, create no material factual issues.

The affidavits of defendant Michael Lauritzen, for the most part, track the facts found to be undisputed by the trial judge, adding only more detail. Lauritzen claims that the Wisconsin pickle industry as a whole considers the relationship with migrant workers to be contractual. He explains that hourly compensation does not maximize revenues, and that the more proficient migrants would not work except through a contractual relationship. He denies that the workers receive any compensation if there are no pickle harvest sale proceeds. Other aspects of the pickle business, Lauritzen points out, such as crop dusting, also are done by contract. Nothing in the Lauritzen affidavit differs in any substantial way from the trial court's view of the facts, except that stress is placed on certain details in an effort to make an employment arrangement appear to be more than it is.

## II. STANDARDS OF REVIEW

◼ We need not generally review again the requirements of disposition by summary judgment,[4] except to note that a minor factual dispute does not preclude summary judgment. The disputed facts must be "outcome determinative under the governing law." *Hossman v. Spradlin,* 812 F.2d 1019, 1020–21 (7th Cir.1987) (per curiam); *Egger v. Phillips,* 710 F.2d 292, 296 (7th Cir.) (en banc), *cert. denied,* 464 U.S. 918, 104 S.Ct. 284, 78 L.Ed.2d 262 (1983). The court should neither "look the other way"

to ignore genuine issues of material fact, nor "strain to find" material fact issues where there are none, and we shall not. *Tillett v. J.I. Case Co.,* 756 F.2d 591 (7th Cir.1985); *Mintz v. Mathers Fund, Inc.,* 463 F.2d 495, 498 (7th Cir.1972).

It is well recognized that under the FLSA the statutory definitions regarding employment[5] are broad and comprehensive in order to accomplish the remedial purposes of the Act. *See, e.g., United States v. Rosenwasser,* 323 U.S. 360, 362–63, 65 S.Ct. 295, 296, 89 L.Ed. 301 (1945); *Real v. Driscoll Strawberry Associates, Inc.,* 603 F.2d 748, 754 (9th Cir.1979). Courts, therefore, have not considered the common law concepts of "employee" and "independent contractor" to define the limits of the Act's coverage. We are seeking, instead, to determine "economic reality." *Brock v. Mr. W Fireworks, Inc.,* 814 F.2d 1042, 1043 (5th Cir.1987); *Karr v. Strong Detective Agency, Inc.,* 787 F.2d 1205, 1207 (7th Cir.1986). For purposes of social welfare legislation, such as the FLSA, " 'employees are those who as a matter of economic reality are dependent upon the business to which they render service.' " *Mednick v. Albert Enterprises, Inc.,* 508 F.2d 297, 299 (5th Cir. 1975) (quoting *Bartels v. Birmingham,* 332 U.S. 126, 130, 67 S.Ct. 1547, 1549, 91 L.Ed. 1947 (1947)).

◼ In seeking to determine the economic reality of the nature of the working relationship, courts do not look to a particular isolated factor but to all the circumstances of the work activity. *Rutherford Food Corp. v. McComb,* 331 U.S. 722, 730, 67 S.Ct. 1473, 1476, 91 L.Ed. 1772 (1947). Certain criteria have been developed to assist in determining the true nature of the relationship, but no criterion is by itself, or by its absence, dispositive or controlling.

Among the criteria courts have considered are the following six:

in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). To "[e]mploy includes to suffer or permit to work." 29 U.S.C. § 203(g).

---

4. Fed.R.Civ.P. 56(c).

5. The Act defines an employee simply as "any individual employed by an employer." 29 U.S.C. § 203(e)(1). An "employer" is defined to include "any person acting directly or indirectly

1) the nature and degree of the alleged employer's control as to the manner in which the work is to be performed;

2) the alleged employee's opportunity for profit or loss depending upon his managerial skill;

3) the alleged employee's investment in equipment or materials required for his task, or his employment of workers;

4) whether the service rendered requires a special skill;

5) the degree of permanency and duration of the working relationship;

6) the extent to which the service rendered is an integral part of the alleged employer's business.

See Bartels v. Birmingham, 332 U.S. 126, 130, 67 S.Ct. 1547, 1549, 91 L.Ed. 1947 (1947); Rutherford Food Corp., 331 U.S. at 730, 67 S.Ct. at 1476; United States v. Silk, 331 U.S. 704, 716, 67 S.Ct. 1463, 1469, 91 L.Ed. 1757 (1947); see also Donovan v. Dial-America Marketing, Inc., 757 F.2d 1376, 1382 (3d Cir.), cert. denied, 474 U.S. 919, 106 S.Ct. 246, 88 L.Ed.2d 255 (1985); Donovan v. Brandel, 736 F.2d 1114, 1119–20 (6th Cir.1984). This court previously has held that the determination of workers' status is a legal rather than a factual one, and therefore not subject to the clearly erroneous standard of review. Karr, 787 F.2d at 1206. The underlying facts, however, are necessarily subject to that standard. Id.

The Fifth Circuit recently discussed the types of findings involved in determining whether workers are employees within the meaning of the FLSA. Mr. W Fireworks, 814 F.2d at 1044–45. According to the Fifth Circuit, a district court makes three kinds of findings under the Act. The first are the historical findings of fact that underlie the findings regarding the six factors mentioned above. An example of such a finding in this case is the court's finding that the migrant workers supplied their own gloves. As the Fifth Circuit found, "[i]t is beyond cavil ... that these findings of historical fact are subject to the clearly erroneous rule of Federal Rule of Civil Procedure 52(a)." Id. at 1044.

The findings as to the six factors themselves constitute the second tier of findings under the Act. The Fifth Circuit explained that these findings are "plainly and simply based on inferences from facts and thus are questions of fact that we may set aside only if clearly erroneous." Id. The court went on to say that

[t]wo caveats are necessary, however. Although we may only set aside factual findings of the district court if we have a firm and definite conviction that a mistake has been made, this must not serve as an excuse to avoid comprehensively canvasing the record with great care. For us to do otherwise, would abrogate our role and duty as a reviewing court. Congress surely did not intend Rule 52(a) to constrict as a Victorian corset, binding the courts of appeals to the findings of the district' court absent a careful and fitting examination. Second, we must ensure that the factfinding of the district court is performed with the proper legal standards in mind. Only then can the inferences that reasonably and logically flow from the historical facts represent a correct application of law to fact. The district court's analysis, of course, is subject to plenary review by this court, to ensure that the district court's understanding of the law is proper.

Id. at 1044–45 (citations omitted).

The third level of findings is the district court's ultimate conclusion as to whether the workers are employees or independent contractors. The Fifth Circuit found, as we have, that the legal effect of the fact findings is a question of law. Id. at 1045; Karr, 787 F.2d at 1206.

## III. ANALYSIS

In a number of agricultural cases, albeit nonpickle cases, courts have applied the six criteria to find an employment, rather than a contractual, relationship. See, e.g., Beliz v. W.H. McLeod & Sons Packing Co., 765 F.2d 1317 (5th Cir.1985); Driscoll Strawberry Associates, 603 F.2d 748; Hodgson v. Okada, 472 F.2d 965 (10th Cir.1973). In some other cases involving migrant workers in similar circumstances, an employ-

ment relationship was either admitted or assumed, and was therefore not an issue. *See, e.g., Washington v. Miller*, 721 F.2d 797 (11th Cir.1983); *Bueno v. Mattner*, 633 F.Supp. 1446 (W.D.Mich.1986); *Alzalde v. Ocanas*, 580 F.Supp. 1394 (D.Colo.1984).

In one case, however, *Donovan v. Brandel*, the Sixth Circuit affirmed the district court in classifying migrant workers harvesting pickles, under circumstances similar to those here, as independent contractors, not employees. 736 F.2d 1114 (6th Cir.1984). Even in its own circuit, however, that case has been narrowed and distinguished. Although *Donovan v. Gillmor*, 535 F.Supp. 154 (N.D.Ohio), *appeal dismissed*, 708 F.2d 723 (6th Cir.1982), was decided before *Brandel*, the pre-*Brandel* holding in *Gillmor* was thereafter reexamined by the same district court in 1986. After the *Brandel* decision was announced in that circuit, the district court reaffirmed its original, inconsistent, holding in an unpublished order. *Brandel* itself took note of the prior contrary holding in *Gillmor* and distinguished *Gillmor* on a factual basis without revealing which factual distinctions the court considered to be critical. 736 F.2d at 1120, n. 11. Although some factual differences are evident between this case and *Gillmor*, the situations are basically similar.[6] *Brandel* is also similar to this case, but we view the factual similarities differently than did the *Brandel* court.

### A. *Control*

▪ The *Brandel* court found that the landowner, under a sharecropping arrangement, had effectively relinquished control of harvesting to the migrants. The court considered this to be a factor in its finding that the migrant workers were independent contractors. In view of the pervasive overall control retained by the defendants here, we do not reach the same finding. We view the wage arrangement as no more than a way to effectively motivate employees, and to provide a means of determining their wages.

Brandel, according to the Sixth Circuit, did not retain "the right to dictate the manner in which the details of the harvesting function are executed." *Brandel*, 736 F.2d at 1119. For example, he did not appear in the fields to supervise the workers, or set hours for them to work. In this case, the defendants did occasionally visit the families in the fields. The workers sometimes referred to Michael Lauritzen as the "boss," and some of them expressed a belief that he had the right to fire them. Moreover, unlike the Sixth Circuit, we believe that the defendants' right to control applies to the entire pickle-farming operation, not just the details of harvesting. The defendants exercise pervasive control over the operation as a whole. We therefore agree with the district court that the defendants did not effectively relinquish control of the harvesting to the migrants. *Lauritzen I*, 624 F.Supp. at 968.

### B. *Profit and Loss*

▪ The Sixth Circuit found that the migrant workers had the opportunity to increase their profits through the management of their pickle fields. *Id.* Although the court found little or no evidence in the record supporting a finding that the workers were exposed to any risk of loss, it found the fact that their remuneration would increase through their management efforts to be dispositive of the profit and loss analysis. We do not agree. Although the profit opportunity may depend in part on how good a pickle picker is, there is no corresponding possibility for migrant worker loss. As the *Gillmor* court held, a reduction in money earned by the migrants is not a loss sufficient to satisfy the criteria for independent contractor status. 535 F.Supp. at 162. The migrants have invested nothing except for the cost of their work gloves, and therefore have no investment to lose. Any reduction in earnings due to a poor pickle crop is a loss of wages, and not of an investment. *Lauritzen I*, 624 F.Supp. at 969.

---

**6.** In *Gillmor* the migrants did harvest crops other than pickles, for which they were paid additional sums. They always worked exclusively for the one employer.

## C. *Capital Investment*

The capital investment factor is interrelated to the profit and loss consideration. The *Gillmor* court characterized the investment in this context to be "large expenditures, such as risk capital, capital investments, and not negligible items or labor itself." 535 F.Supp. at 161. The workers here are responsible only for providing their own gloves. Gloves do not constitute a capital investment. As in *Gillmor*, "[e]verything else, from farm equipment, land, seed, fertilizer, [and] insecticide to the living quarters of the migrants is supplied by the defendants." *Id.* at 162. *See Lauritzen I*, 624 F.Supp. at 969. Although in *Brandel* the migrant furnished the pails, the *Brandel* court minimized this factor by saying that in pickle harvesting by hand there is no need for heavy capital investment by the worker, and the overall size of the investment by the employer relative to that by the worker is irrelevant. 736 F.2d at 1118–19. To the contrary, we believe that the migrant workers' disproportionately small stake in the pickle-farming operation is an indication that their work is not independent of the defendants.

## D. *Degree of Skill Required*

Although a worker must develop some specialized skill in order to recognize which pickles to pick when, this development of occupational skills is no different from what any good employee in any line of work must do. Skills are not the monopoly of independent contractors. *See Lauritzen I*, 624 F.Supp. at 969. The *Brandel* court found that a high degree of skill is involved in caring for the pickle plants and picking the pickles. 736 F.2d at 1117–18. We agree that some skill is required, but we do not find that this level of skill sets the pickle harvester apart from the harvester of other crops. The migrants' talent and their physical endurance in the hot sun do not change the nature of their employment relationship with the defendants.

## E. *Permanency*

Another factor in the employment analysis is permanency and duration of the relationship. The Sixth Circuit in *Brandel* found that the vast majority of harvesters have only a temporary relationship with the employee which suggested to the court an independent contractual arrangement. *Id.* Many seasonal businesses necessarily hire only seasonal employees, but that fact alone does not convert seasonal employees into seasonal independent contractors. Many migrant families return year after year. In *Brandel* the returning migrant families comprised as high a proportion as forty percent to fifty percent of the work force. *Id.* at 1117. In this case the district court found that the migrant workers did not have the sort of permanent relationship associated with employment. *Lauritzen I*, 624 F.Supp. at 969. Nevertheless, when the district court considered its finding in light of the economic reality of the parties' entire work relationship, the court did not consider this one criterion to be dispositive. Although we have serious doubts about this particular district court determination in view of cases such as *Beliz v. W.H. McLeod & Sons Packing Co.*, 765 F.2d 1317, 1328 (5th Cir.1985), we need not disturb that finding for the purposes of this case. We agree with the *Gillmor* court that however temporary the relationship may be it is permanent and exclusive for the duration of that harvest season. 535 F.Supp. at 162–63. One indication of permanency in this case is the fact that it is not uncommon for the migrant families to return year after year.

## F. *Harvesting as an Integral Part of Defendants' Business*

Another factor we consider briefly is the extent to which the service of migrants may be considered an integral part of the pickle-picking business. The district court held that the migrants' work was an integral part of the business, as even the court in *Brandel* conceded. *Lauritzen I*, 624 F.Supp. at 969; *Brandel*, 736 F.2d at 1120. The defendant here takes a contrary view on appeal claiming that the record is insufficient to sustain the district court finding. It does not take much of a record to demonstrate that picking the pickles is a necessary and integral part of the pickle

**1538**

business unless the employer's investment, planting, and cultivating activities are only to serve the purpose of raising ornamental pickle vines. That result would likely disappoint all good pickle lovers.

### G. *Dependence of Migrant Workers*

 Our final task is to consider the degree to which the migrant families depend on the defendants. Economic dependence is more than just another factor. It is instead the focus of all the other considerations.

> The [other] tests are aids—tools to be used to gauge the degree of dependence of alleged employees on the business with which they are connected. It is *dependence* that indicates employee status. Each test must be applied with that ultimate notion in mind. More importantly, the final and determinative question must be whether the total of the testing establishes the personnel are so dependent upon the business with which they are connected that they come within the protection of the FLSA or are sufficiently independent to lie outside its ambit.

*Usery v. Pilgrim Equipment Co.,* 527 F.2d 1308, 1311–12 (5th Cir.) (emphasis in original), *cert. denied,* 429 U.S. 826, 97 S.Ct. 82, 50 L.Ed.2d 89 (1976). The district court held that the migrants were economically dependent on the defendants during the harvest season. *Lauritzen I,* 624 F.Supp. at 969. If the migrant families are pickle pickers, then they need pickles to pick in order to survive economically. The migrants clearly are dependent on the pickle business, and the defendants, for their continued employment and livelihood. *Donovan v. DialAmerica Marketing, Inc.,* 757 F.2d 1376, 1385 (3d Cir.), *cert. denied,* 474 U.S. 919, 106 S.Ct. 246, 88 L.Ed.2d 255 (1985). That is why many of them return year after year. The defendants contend that skilled migrant families are in demand in the area and do not need the defendants. Were it not for the defendants the migrant families would have to find some other pickle grower who would hire them. Until they found another grower, they would be unemployed. It is not necessary to show that workers are unable to find work with any other employer to find that the workers are employees rather than contractors.

 We cannot say that the migrants are not employees, but, instead, are in business for themselves and sufficiently independent to lie beyond the broad reach of the FLSA. They depend on the defendants' land, crops, agricultural expertise, equipment, and marketing skills. They are the defendants' employees.

## IV. CONCLUSION

 No trial is needed to sort out the material facts in these circumstances in order to come to the conclusion of law that these migrant workers are employees, entitled to the protection of the FLSA. The purpose of the Act is to protect employees from low wages and long hours, and "to free commerce from the interferences arising from the production of goods under conditions that were detrimental to the health and well-being of workers." *Rutherford Food Corp. v. McComb,* 331 U.S. 722, 727, 67 S.Ct. 1473, 1475, 91 L.Ed. 1772 (1971). In this case, for example, some children under twelve years of age are in the fields. Although there is no suggestion in the record that the defendants are abusing the children in any way, the child labor provisions of the Act are intended for their benefit. It may be that the defendants' pickle operation is exemplary and conducted pursuant to standards even higher than those of the FLSA, but that does not allow the defendants to circumvent the Act. Neither does the defendants' gloomy prediction that application of the Act will have a devastating economic impact on the pickle business relieve them from complying with the Act's provisions. In any event, that argument is one for the Congress, not the courts. The basic arrangement between the defendants and the pickle pickers which, according to the defendants, produces the highest economic return for both grower and picker, need not be altered. All that need change is the label which the defendants apply to the arrangement. The defendants need only think of the proceeds

paid to the pickle pickers as wages, keep the necessary records, and make sure they abide by the protections that the Act accords to working children.[7]

AFFIRMED.

EASTERBROOK, Circuit Judge, concurring.

Are cucumber pickers "employees" for purposes of the Fair Labor Standards Act? *Donovan v. Brandel*, 736 F.2d 1114 (6th Cir.1984), says "no" as a matter of law. My colleagues say "yes" as a matter of law. Both opinions march through seven "factors"—each important, none dispositive. As the majority puts it: "Certain criteria have been developed to assist in determining the true nature of the relationship, but no criterion is by itself, or by its absence, dispositive or controlling." At 1534. Courts must examine "all the circumstances" in search of "economic reality." *Ibid.*

It is comforting to know that "economic reality" is the touchstone. One cringes to think that courts might decide these cases on the basis of economic fantasy. But "reality" encompasses millions of facts, and unless we have a legal rule with which to sift the material from the immaterial, we might as well examine the facts through a kaleidoscope. Which facts matter, and why? A legal approach calling on judges to examine all of the facts, and balance them, avoids formulating a rule of decision. The price of avoidance should be committing the decisions to the finders of fact, as our inability to fulfill Justice Holmes's belief that all tort law could be reduced to formulas after some years of experience[1] has meant that juries today decide the most complex products liability cases without substantial guidance from legal principles. Surely Holmes was right in believing that legal propositions ought to be in the form of rules to the extent possible. E.g., *Aguilera v. Cook County Police and Corrections Merit Board*, 760 F.2d 844, 847–48

(7th Cir.1985). Why keep cucumber farmers in the dark about the legal consequences of their deeds?

People are entitled to know the legal rules before they act, and only the most compelling reason should lead a court to announce an approach under which no one can know where he stands until litigation has been completed. Litigation is costly and introduces risk into any endeavor; we should struggle to eliminate the risk and help people save the costs. Unless some obstacle such as inexperience with the subject, a dearth of facts, or a vacuum in the statute books intervenes, we should be able to attach legal consequences to recurrent factual patterns. Courts have had plenty of experience with the application of the FLSA to migrant farm workers. Fifty years after the Act's passage is too late to say that we still do not have a legal rule to govern these cases. My colleagues' balancing approach is the prevailing method, which they apply carefully. But it is unsatisfactory both because it offers little guidance for future cases and because any balancing test begs questions about which aspects of "economic reality" matter, and why.

I

Consider the problems with the balancing test. These are not the factors the *Restatement (Second) of Agency* § 2(3) (1958) suggests for identifying "independent contractors." The *Restatement* takes the view that the right to control the physical performance of the job is the central element of status as an independent contractor. My colleagues, joining many other courts, say that this approach is inapplicable because we should "accomplish the remedial purposes of the Act" (at 1534):

> Courts, therefore, have not considered the common law concepts of "employee" and "independent contractor" to define the limits of the Act's coverage. We are

---

7. We acknowledge the brief of *amicus curiae* filed by Legal Action of Wisconsin, Inc., supporting the view that the migrant harvesters are employees, not independent contractors.

1. Oliver Wendell Holmes, Jr., *The Common Law* 111–13, 123–26 (1881).

seeking, instead, to determine "economic reality."

This implies that the definition of "independent contractor" used in tort cases is inconsistent with "economic reality" but that the seven factors applied in FLSA cases capture that "reality." In which way did "economic reality" elude the American Law Institute and the courts of 50 states? What kind of differences between FLSA and tort cases are justified? A definition under which "in the application of social legislation employees are those who as a matter of economic reality are dependent upon the business to which they render service" (*Bartels v. Birmingham*, 332 U.S. 126, 130, 67 S.Ct. 1547, 1549, 91 L.Ed. 1947 (1947)) does not help to isolate the elements of "reality" that matter.

Consider, too, the seven factors my colleagues distill from the cases. The first is the extent to which the supposed employer possesses a right to control the workers' performance. This is the core of the common law definition. The parties agree that Lauritzen did not prescribe or monitor the migrant workers' methods of work but instead measured output, the weight and kind of cucumbers picked. Lauritzen did not say who could work but instead negotiated only with the head of each migrant family. Lauritzen did not control how long each member of the family worked. This absence of control over who shall work, when, and how, strongly suggests an independent contractor relation at common law. Cf. *United States v. Orleans*, 425 U.S. 807, 813–16, 96 S.Ct. 1971, 1975–76, 48 L.Ed.2d 390 (1976) (lack of control over "detailed physical performance" establishes independent contractor status as a matter of law for purposes of the Federal Tort Claims Act). Perhaps Lauritzen could have dictated the workers' identities and methods, but inferences run in favor of the person opposing the motion for summary judgment.

My colleagues admit that the migrant workers controlled their own working hours and picking methods, but discount these facts on the grounds that what counts is Lauritzen's "right to control ... the entire pickle-farming operation" (at 1536). If this is so, Pittsburgh Plate Glass must be an "employee" of General Motors because GM controls "the entire automobile manufacturing process" in which windshields from PPG are used. This method of analysis makes everyone an employee.

The second factor is whether the worker has an opportunity to profit (or is exposed to a risk of loss) through the application of managerial skills. My colleagues say that this indicates "employment" here because each worker has "invested nothing except for the cost of ... work gloves, and therefore [has] no investment to lose" (at 1536). But the opportunity to obtain profit from efficient management is not the same as exposing a stock of capital to a risk of loss. (*That* subject is the third factor, discussed below.) A consultant analyzing the operation of an assembly line also may furnish few tools except for a stopwatch, pencil, and clipboard, but such a person unquestionably is an independent contractor. The "managerial" skill may lie in deploying a work force efficiently. The head of each migrant family decides which family members works, for how long, on what plot of land. That is the same sort of managerial decision customarily made by supervisors in a hierarchical organization.

Third in my colleagues' list is the worker's investment in equipment or materials, that is, physical capital. The record is clear that the migrant workers possess little or no physical capital.[2] This is true of many workers we would call independent contractors. Think of lawyers, many of whom do not even own books. The bar sells human capital rather than physical capital, but this does not imply that lawyers are "employees" of their clients under

---

**2.** Physical capital is not, however, the same thing as a "disproportionately small stake in the pickle-farming operation" (slip op. 13). The laborers' share of the farm's gross income exceeds 50%, giving the migrant workers a very large stake indeed in the successful harvest and marketing of the crop. (The migrants receive 50% of Lauritzen's gross, plus housing and end-of-season bonuses.)

the FLSA.[3]

The fourth factor, whether the worker possesses a "special skill," would exclude lawyers and others rich in human capital. The migrant workers, by contrast, are poor in human capital, so this factor augurs for a conclusion of employment.

Fifth in the list is "the degree of permanency and duration of the working relationship." This can be measured, but it is hard to see why it is significant. Lawyers may work for years for a single client but be independent contractors; hamburger-turners at fast-food restaurants may drift from one job to the next yet be employees throughout. The migrant workers who picked Lauritzen's cucumbers labor on many different farms over the course of a year, but work full-time at the pickle operation for more than a month. Surely an engineering consultant who worked full-time on a given job, and frequently worked with a single manufacturer, but did five to ten jobs a year, would be an independent contractor. What matters for the migrant workers: that they have many jobs and float among employers, or that they work full-time for the duration of the harvest? Without a legal theory we cannot tell.

Factor number six, the "extent to which the service rendered is an integral part of the employer's business," is one of those bits of "reality" that has neither significance nor meaning. *Everything* the employer does is "integral" to its business— why else do it? An omission to pick the cucumbers would be fatal to Lauritzen, but then so would an omission to plant the vines or water them. An omission to design a building would be fatal to an effort to build it, but this does not imply that architects are the "employees" of firms that want to erect new buildings. Acquiring tires is integral to the business of Chrysler, but the tires come from independent contractors. Perhaps "integral" in this formulation could mean "part of inte-

grat*ed* operation", which would distinguish tires but leave unanswered the question why the difference should have a legal consequence.

Seventh and finally we have "dependence." "Economic dependence is more than just another factor. It is instead the focus of all the other considerations." at 1538. The majority proceeds (*id.* at 1538, citations omitted):

> The district court held that the migrants were economically dependent on the defendants during the harvest season. If the migrant families are pickle pickers, then they need pickles to pick in order to survive economically. The migrants clearly are dependent on the pickle business, and the defendants, for their continued employment and livelihood. That is why many of them return year after year. The defendants contend that skilled migrant families are in demand in the area and do not need the defendants. Were it not for the defendants the migrant families would have to find some other pickle grower who would hire them. Until they found another grower, they would be unemployed. It is not necessary to show that workers are unable to find work with any other employer to find that the workers are employees rather than contractors.

This is the nub of both the district court's opinion and my colleagues' approach. Part of it is factually unsupported. There is *no* evidence that the migrant families pick only pickles or are "dependent on the pickle business." For all we can tell, these families pick oranges in California, come to Wisconsin to pick cucumbers, and move on to New York to harvest apples. We know they work year-round, and cucumbers are not harvested year-round in the United States. The point of my colleagues' discussion of factors 2–4 is that these migrant workers are not specialized to pickles.

---

**3.** A story current among electrical engineers has it that after analyzing a destructive harmonic vibration in one of Edison's new generators, Prof. Steinmetz submitted an invoice for $5,000. An irate Edison demanded itemization. Steinmetz's new bill said:

1. Telling you to remove the third coil from the top .................................... $10.00
2. Knowing which coil to remove .......... $4,990.00 ·

Steinmetz, selling only expertise, was the paradigm of an independent contractor.

Now the families may be dependent on the pickle business once they arrive at Lauritzen's farm and settle down to work. If a flood carried away the cucumbers, the migrants would be hard pressed to find other work immediately. This, however, is true of anyone, be he employee or independent contractor. A lawyer engaged full-time on a complex case may take a while to find new business if the case unexpectedly settles. Migrant workers are no more dependent on Lauritzen than are sellers of fertilizer, who rely on the trade of the locality and are in the grip of economic forces beyond their control, and the person who fixes Lauritzen's irrigation equipment, a classic independent contractor. The conclusion of dependence in this case is an artifact of looking at the subject *ex post*—that is, after the workers are in the cucumber fields. To determine whether they are dependent on Lauritzen, we have to look at the arrangement *ex ante*.

The usual argument that workers are "dependent" on employers—frequently a euphemism for a concern about monopsony—is that they are immobile. The coal miner in a company town, the weaver who lives next door to one textile mill and 50 miles from the next, may be offered a wage less than the one that would be necessary to induce a new worker to come to town. The employer takes advantage of the family ties and other things that may fracture some labor markets into small regions, each of which may be less than fully competitive. Migrant workers, by definition, have broken the ties that bind them to one locale. They sell their skills in a national market. It is unlikely that they receive less than the competitive wage. That wage may be low—it will be if the skills they possess are common—and the FLSA may have something to say about that wage. It is not possible, however, to get to that conclusion by talking about "dependence." Lauritzen is dependent on migrant labor; he cannot move his farm, or change his crop after planting cucumbers. The workers, by contrast, can and will go elsewhere if Lauritzen offers too little money. The majority's observation when dealing with the fifth "factor" that families come back to Lauritzen year after year, and see 624 F.Supp. at 969, indicates that he offers a satisfactory return on their labor.

So the seven factors are of uncertain import in theory and cut both ways in practice. The list also is curious by its omission. It does not mention the method of compensation. One common feature of an independent contractor relation is compensation by a flat fee (common in the construction business) or a percentage of revenues (the sharecropper and the investment bank). The migrants who picked Lauritzen's crop received more than half of the proceeds of the sales. True, piecework and commission sales are not inconsistent with status as an "employee," see *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 67 S.Ct. 1473, 91 L.Ed. 1772 (1947); *Mechmet v. Four Seasons Hotels, Ltd.*, 825 F.2d 1173 (7th Cir.1987); *Silent Woman, Ltd. v. Donovan*, 585 F.Supp. 447 (E.D.Wis.1984); but the wrinkle here is that the migrants share the market risk with Lauritzen. Each gets part of the sales price, which may rise or fall with the demand for pickles and the supply of cucumbers each season. If the price collapses, the workers and Lauritzen share the loss; so too they share the gain if the price rises. This is not an ordinary attribute of employment. Employees' "profit sharing" arrangements rarely provide for loss sharing. Why should this be irrelevant to the status of the migrant workers?

If we are to have multiple factors, we also should have a trial. A fact-bound approach calling for the balancing of incommensurables, an approach in which no ascertainable legal rule determines a unique outcome, is one in which the trier of fact plays the principal part. E.g., *Wisconsin Real Estate Investment Trust v. Weinstein*, 781 F.2d 589, 597–99 (7th Cir.1986). That there is a legal overlay to the factual question does not affect the role of the trier of fact. See *Pullman–Standard v. Swint*, 456 U.S. 273, 285–90, 102 S.Ct. 1781, 1788–90, 72 L.Ed.2d 66 (1982) ("ultimate" questions); *Mucha v. King*, 792 F.2d 602, 604–06 (7th Cir.1986) ("mixed" questions). See also *Icicle Seafoods, Inc. v. Worthing-*

*ton,* 106 S.Ct. 1527 (1986) (applying Rule 52(a) standards to a determination that workers are "seamen" for FLSA purposes); *Brock v. Mr. W Fireworks,* 814 F.2d 1042, 1044 (5th Cir.1987) (treating the definition of "employee" under the FLSA as one of fact). Given *Icicle* we cannot readily say, as my colleagues do (at ·1535), that the "ultimate conclusion as to whether the workers are employees or independent contractors" is one of law. The drawing of inferences from subordinate to "ultimate" facts is a task for the trier of fact—if, under the governing legal rule, the inferences are subject to legitimate dispute.

## II

We should abandon these unfocused "factors" and start again. The language of the statute is the place to start. Section 3(g), 29 U.S.C. § 203(g), defines "employ" as including "to suffer or permit to work". This is "the broadest definition '... ever included in any one act.'" *United States v. Rosenwasser,* 323 U.S. 360, 363 n. 3, 65 S.Ct. 295, 296 n. 3, 89 L.Ed. 301 (1945), quoting from Sen. Hugo Black, the Act's sponsor, 81 Cong.Rec. 7657 (1937). No wonder the common law definition of "independent contractor" does not govern. *Walling v. Portland Terminal Co.,* 330 U.S. 148, 150–51, 67 S.Ct. 639, 640, 91 L.Ed. 809 (1947); *Beliz v. W.H. McLeod & Sons Packing Co.,* 765 F.2d 1317, 1327 (5th Cir. 1985). The definition, written in the passive, sweeps in almost any work done on the employer's premises, potentially any work done for the employer's benefit or with the employer's acquiescence.

We have been told to construe this statute broadly. *Rutherford Food Corp.; Tony and Susan Alamo Foundation v. Secretary of Labor,* 471 U.S. 290, 296, 105 S.Ct. 1953, 1959, 85 L.Ed.2d 278 (1985). Knowing the end in view does not answer hard questions, for it does not tell us *how far* to go in pursuit of that end. *Rodriguez v. United States,* —— U.S. ——, 107 S.Ct. 1391, 1393, 94 L.Ed.2d 533 (1987). "[A]lways the question about a 'remedial' statute is, *how much* help was it intended to give the benefited group?" *Moore v. Tandy Corp.,* 819 F.2d 820, 822 (7th Cir. 1987) (emphasis in original). See *In re Erickson,* 815 F.2d 1090 (7th Cir.1987); *Walton v. United Consumers Club, Inc.,* 786 F.2d 303, 310–11 (7th Cir.1986). To know how far is far enough, we must examine the history and functions of the statute.

Unfortunately there is no useful discussion in the legislative debates about the application of the FLSA to agricultural workers. This drives us back to more general purposes—those of the FLSA in general, and those of the common law definition of the independent contractor. Section 2 of the FLSA, 29 U.S.C. § 202, supplies part of the need. Courts are "to correct and as rapidly as practical eliminate", § 2(b), the "labor conditions detrimental to the maintenance of the minimum standard of living necessary to health, efficiency, and general well-being of workers", § 2(a). We recently summarized the purposes of the overtime provisions of the FLSA—which turn out to be the important ones here (in conjunction with the child labor provisions) in light of the parties' apparent belief that the migrant workers regularly earn more than the minimum wage. See *Mechmet,* 825 F.2d at 1176:

> The first purpose was to prevent workers willing (maybe out of desperation ...) to work abnormally long hours from taking jobs away from workers who prefer to work shorter hours. In particular, unions' efforts to negotiate for overtime provisions in collective bargaining agreements would be undermined if competing, non-union firms were free to hire workers willing to work long hours without overtime. The second purpose was to spread work and thereby reduce unemployment, by requiring the employer to pay a penalty for using fewer workers for the same amount of work as would be necessary if each worker worked a shorter week. The third purpose was to protect the overtime workers from themselves: long hours of work might impair their health or lead to more accidents (which might endanger other workers as well). This purpose may seem inconsistent with allowing overtime work if the

employer pays time and a half, but maybe the required premium for overtime pay is intended to assure that workers will at least be compensated for the increased danger of working when tired. To recite these purposes is not to endorse them; maybe, as Lauritzen says, the FLSA does more harm than good by foreclosing desirable packages of incentives (such as payment by reference to results rather than hours) or by reducing the opportunities for work, and hence the income, of those, such as migrant farm workers, who cannot readily enter white-collar professions and make more money while working fewer hours. The system in place on Lauritzen's farm may be the most efficient yet devised—best for owners, workers, and consumers alike—but whether it is efficient or not is none of our business. The judicial function is to implement what Congress did, not to ask whether Congress did the right thing.[4] *Id.* at 1176.

The purposes Congress identified in § 2 and we amplified in *Mechmet* strongly suggest that the FLSA applies to migrant farm workers. We also observed in *Mechmet* that the statute was designed to protect workers without substantial human capital, who therefore earn the lowest wages. No one doubts that migrant farm workers are short on human capital; an occupation that can be learned quickly[5] does not pay great rewards.

The functions of the FLSA call for coverage. How about the functions of the independent contractor doctrine? This is a branch of tort law, designed to identify who is answerable for a wrong (and therefore, indirectly, to determine who must take care to prevent injuries). To say "X is an independent contractor" is to say that the chain of vicarious liability runs from X's employees to X but stops there. This

concentrates on X the full incentive to take care. It is the right allocation when X is in the best position to determine what care is appropriate, to take that care, or to spread the risk of loss. See *Anderson v. Marathon Petroleum Co.*, 801 F.2d 936, 938–39 (7th Cir.1986); Alan O. Sykes, *The Economics of Vicarious Liability*, 93 Yale L.J. 1231 (1984). This usually follows the right to control the work. Someone who surrenders control of the details of the work—often to take advantage of the expertise (= human capital) of someone else —cannot determine what precautions are appropriate; his ignorance may have been the principal reason for hiring the independent contractor. Such a person or firm specifies the outputs (design the building; paint the fence) rather than the inputs. Imposing liability on the person who does not control the execution of the work might induce pointless monitoring.[6] All the details of the common law independent contractor doctrine having to do with the right to control the work are addressed to identifying the best monitor and precaution-taker.

The reasons for blocking vicarious liability at a particular point have nothing to do with the functions of the FLSA. The independent contractor will have its own employees, who will be covered by the Act. Electricians are "employees" of someone, even though the electrical subcontractor is not the employee of the general contractor. Indeed, the details of independent contractor relations are fundamentally contractual. Firms can structure their dealings as "employment" or "independent contractor" to maximize the efficiency of incentives to work, monitor, and take precautions. Cf. *Moore*; Paul H. Rubin, *The Theory of the Firm and the Economics of the Franchise Contract*, 21 J.L. & Econ. 223 (1978). The

---

4. Or whether, as seems likely, the parties can cope with a change in the legal rule. If the Act applies, Lauritzen can maintain a system of incentives tied to the price the cucumbers will fetch. The farm must keep records and ensure that the total payment exceeds the statutory minimum; if it does this, the FLSA is indifferent to the device by which the excess is determined.

5. The parties dispute whether "quickly" means days or only minutes, but the difference is unimportant for current purposes.

6. If the parties could re-contract at no cost about the allocation of damages, of course, it would produce no change at all if both parties were solvent. R.H. Coase, *The Problem of Social Cost*, 3 J.L. & Econ. 1 (1960).

FLSA is designed to defeat rather than implement contractual arrangements. If employees voluntarily contract to accept $2.00 per hour, the agreement is ineffectual. See *Walton*, 786 F.2d at 305–06. In other FLSA cases we have looked past the contractual terms. E.g., *Mechmet*, 825 F.2d at 1177 ("[w]e attach no weight to the fact that the collective bargaining agreement between the Ritz–Carlton and its waiters describes the waiters' income from the service charge as a 'gratuity' rather than a 'commission.'"). In this sense "economic reality" rather than contractual form is indeed dispositive.

The migrant workers are selling nothing but their labor. They have no physical capital and little human capital to vend. This does not belittle their skills. Willingness to work hard, dedication to a job, honesty, and good health, are valuable traits and all too scarce. Those who possess these traits will find employment; those who do not cannot work (for long) even at the minimum wage in the private sector. But those to whom the FLSA applies must include workers who possess *only* dedication, honesty, and good health. So the baby-sitter is an "employee" even though working but a few hours a week, and the writer of novels is not an "employee" of the publisher even though renting only human capital. The migrant workers labor on the farmer's premises, doing repetitive tasks. Payment on a piecework rate (e.g., 1¢ per pound of cucumbers) would not take these workers out of the Act, any more than payment of the sales staff at a department store on commission avoids the statute. The link of the migrants' compensation to the market price of pickles is not fundamentally different from piecework compensation. Just as the piecework rate may be adjusted in response to the market (e.g., to 1¢ per 1.1 pounds, if the market falls 10%), imposing the market risk on piecework laborers, so the migrants' percentage share may be adjusted in response to the market (e.g., rising to 55% of the gross if the market should fall 10%) in order to relieve them of market risk. Through such adjustments Lauritzen may end up bearing the whole market risk,

and in the long run must do so to attract workers.

There are hard cases under the approach I have limned, but this is not one of them. Migrant farm hands are "employees" under the FLSA—without regard to the crop and the contract in each case. We can, and should, do away with ambulatory balancing in cases of this sort. Once they know how the FLSA works, employers, workers, and Congress have their options. The longer we keep these people in the dark, the more chancy both the interpretive and the amending process become.