In the

# United States Court of Appeals

## For the Seventh Circuit

---

No. 15-1318

MELISSA CALLAHAN,

*Plaintiff-Appellant,*

*v.*

CITY OF CHICAGO, ILLINOIS,

*Defendant-Appellee.*

---

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 12 C 362 — **Manish S. Shah**, *Judge.*

---

ARGUED NOVEMBER 3, 2015 — DECIDED FEBRUARY 17, 2016

---

Before WOOD, *Chief Judge*, EASTERBROOK, *Circuit Judge*,
and BRUCE, *District Judge*.[*]

EASTERBROOK, *Circuit Judge*. Between January 2009 and
August 2011, Melissa Callahan frequently drove a taxicab in
Chicago. She does not own a cab, nor does she own a medal-
lion that represents the City's permission to operate a taxi.

---

[*] Of the Central District of Illinois, sitting by designation.

She leased both from owners by the week, day, or half day. She brought to the transaction her time, her skill as a driver, and her chauffeur's license, which permits her to operate leased taxis. Callahan asserts, and we assume, that her net proceeds (fares and tips, less lease fees and gasoline) averaged less than the minimum wages required by the Fair Labor Standards Act, 29 U.S.C. §§ 201–19, and the Illinois Minimum Wage Law, 820 ILCS 105/1 to 105/15.

Callahan contends that the City of Chicago must make up the difference. She presents two theories: first that the City's regulations (Chicago sets the rates, per mile and per minute of waiting time, that taxis may charge passengers) are confiscatory, and second that the City's regulations are so extensive that Chicago must be treated as her employer. As far as we can see, both theories are novel; no other federal court has addressed either of them.

*Williamson County Regional Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172 (1985), holds that takings claims usually belong in state court, because the Constitution is not offended if the state pays for what it takes, and state litigation (an inverse condemnation suit) is the way to get a state to pay. But in response to questions at oral argument, Chicago conceded that *Williamson* does not require Callahan to pursue her takings claim in state court, because Illinois provides compensation for physical but not regulatory takings. See 745 ILCS 10/2-103; *Sorrells v. Macomb*, 2015 IL App (3d) 140763 ¶¶ 25–26. Compensation therefore is unavailable in Illinois court, and this permits federal litigation. See *Sorrentino v. Godinez*, 777 F.3d 410, 413–14 (7th Cir. 2015).

District Judge Kennelly dismissed the takings claim under Fed. R. Civ. P. 12(b)(6). 2012 U.S. Dist. Lexis 169755 at *4–

8 (N.D. Ill. Nov. 29, 2012). We agree with his rationale and result, which rest on the fact that Callahan does not own any asset whose market value has been reduced by the City's regulation of taxi fares. Persons who own cabs or medallions are (potentially) adversely affected by caps on what owners can charge to customers—or to drivers (the City sets maximum lease rates). But none of Callahan's property is subject to rate regulation. She owns her own time, but Chicago does not require her to devote any of that time to taxi driving. Callahan and others similarly situated will not drive a taxi unless they believe that they are apt to obtain more income (or other satisfactions) from that occupation than from the next best alternative. Competition in the labor market tells Callahan what an hour of her time is worth, and she cannot recover from the City if she now rues devoting as much time as she did to driving other people's taxis.

Even cab and medallion owners would have a hard time showing a regulatory taking, because Chicago's rate regulation has not driven the price of those assets anywhere near zero. (On the standard for regulatory takings, compare *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003 (1992), with *Horne v. Department of Agriculture*, 135 S. Ct. 2419 (2015).) Chicago limits the number of medallions, producing a regulatory scarcity that offsets the effect on owners of capping what they can charge drivers or passengers. According to the record in this case, medallions sold for $64,000 in 2007. Early in 2013 new medallions went for $360,000 in an auction conducted by the City. Later that year medallions sold from existing to new owners for $348,000. These values imply the absence of confiscatory regulation. Uber entered the Chicago market in fall 2011, but medallion prices still rose substantially between 2007 and 2013. See also Scott Walsten, *Has Ub-*

*er Forced Taxi Drivers to Step Up Their Game?*, The Atlantic (July 9, 2015).

After Judge Kennelly dismissed the takings claim, the case was transferred to Judge Shah, who granted summary judgment in the City's favor on the minimum-wage claims. Judge Shah gave several reasons; we need consider only one of them. An insuperable obstacle to Callahan's suit is the fact that Chicago is not her employer. It acts as a regulator, while minimum-wage laws govern employment.

Callahan does not contend that Illinois supplies a definition of "employer" more expansive than that in the Fair Labor Standards Act, so we turn to 29 U.S.C. §203(g), which says that "employ" includes "suffer or permit to work". The City of Chicago permitted her to drive a cab and thus became her employer, Callahan maintains; and if more were needed, she says, there's the fact that taxis are important to the City. Commerce would be hampered if taxis were unavailable. People use cabs to get to restaurants, to airports, to conventions, to plays and operas, and so on. No taxis, and City tax revenue would collapse as residents fled to New York, Los Angeles, or Anchorage. Because the City gains from having taxis, and has not regulated them out of existence (thus suffering drivers to work), Chicago is every driver's employer and must pay minimum wages plus overtime. So Callahan's argument goes.

This is an extravagant claim. If taxis are vital, so are restaurants and retail shops and hotels and hospitals and … Well, the list is endless. *Everyone* who contributes to city life (and directly or indirectly to the tax base) would be a public employee. Restaurants often fail, and their proprietors may find that they have lost money on the venture; if Callahan is

right, however, every failed restaurateur could turn to the City for the minimum wage. More than wages are at stake. If workers in regulated occupations really are public employees, then they are state actors under 42 U.S.C. §1983 and bound by all of the Constitution, just as the City itself is. No one could be fired in Chicago unless the City approved, after notice and an opportunity for a hearing. Newspaper editors could not edit reporters' stories, because public employees cannot censor speech. Abolishing the distinction between public and private employment would work a legal revolution. See, e.g., *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345 (1974) (heavily regulated electric utility is not a state actor); *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149 (1978) (the UCC's regulation of security interests does not make state actors of those involved in selling collateral); *Rendell-Baker v. Kohn*, 457 U.S. 830 (1982) (extensive regulation and public funding of a school does not make it or its employees state actors).

At oral argument Callahan's lawyer insisted that her contention does not go *that* far. Taxi drivers are special, counsel maintained, because taxis are common carriers and must take all comers. That doesn't do much to confine the scope of the argument, because hotels, restaurants, trains, air carriers, and other places of public accommodation also must accept, without discrimination, all potential paying customers (and hospital emergency rooms must accept patients whether or not they can pay), yet no one thinks that every nurse at a hospital (etc.) is a public employee. It also overstates matters considerably to say, as counsel did, that *Callahan* is a common carrier. She is not required to drive a taxi. *If* she drives a taxi, she is forbidden to discriminate among potential customers, but she is free to pursue a different line of work. As with the takings claim, this part of Callahan's theory elides

the fact that she does not own a cab, a medallion, or any oth-
er asset encumbered by regulatory duties.

The contention that the government permits to work, and
thus employs, everyone it does not *forbid* to work has noth-
ing to recommend it. The theory would produce multiple
employers for every worker—for the United States, the State
of Illinois, Cook County, and other governmental bodies
permit taxi drivers to work in the same sense as Chicago
does. The Occupational Safety and Health Administration
and the National Highway Traffic Safety Administration
have not adopted safety rules so onerous that the taxi busi-
ness must shut down. Yet the goal of the Fair Labor Stand-
ards Act is to regulate employers, not the many governmen-
tal bodies that permit employers to operate. To see this one
has only to skim the statute, which calls on "employers" not
only to pay minimum wages but also to post notices
(§§ 203(m), 218b), maintain accurate time and attendance da-
ta (§211(c)), and enforce maximum hours (§207). Callahan
wants the City of Chicago to guarantee her wages but not to
perform any of the other tasks required of a statutory em-
ployer, yet there's no basis in the FLSA for deeming an em-
ployer to have just a subset of the statutory duties.

Callahan asks us to deem Chicago her employer under
the seven open-ended factors discussed in *Secretary of Labor
v. Lauritzen*, 835 F.2d 1529 (7th Cir. 1987). A concurring opin-
ion questioned the utility of that list, see 835 F.2d at 1539–43,
but we need not decide whether to take a fresh look at the
subject. *Lauritzen* designed its list to help courts choose be-
tween characterizing migrant laborers as employees or as
independent contractors. The agricultural laborers per-
formed their tasks on Lauritzen's cucumber farm. When one

person compensates another for work done on his property, the statutory phrase "suffer or permit to work" implies the existence of an employment relation, even when the workers set their own schedules and choose their own harvesting techniques. Callahan may have driven on the City's streets, but Chicago did not "suffer or permit" her to be there; the State of Illinois sets the requirements for drivers' and chauffeurs' licenses. Callahan's suit does not require a choice between employment and independent-contractor status. The core question is whether extensive regulation makes the government an employer of the regulated parties. Our answer to that question is "no."

AFFIRMED