Scott A. HAGEMAN, Plaintiff
and Appellant,

v.

PARK WEST GARDENS and Midwest
Management, Defendants and
Appellees.

Civ. No. 910193.

Supreme Court of North Dakota.

Jan. 14, 1992.

Hannig Law Office, Moorhead, for plaintiff and appellant; argued by Jeffrey R. Hannig.

Anderson & Bailly, Fargo, for defendants and appellees, argued by Gregory L. Thompson.

ERICKSTAD, Chief Justice.

Scott A. Hageman appeals from the judgment of the District Court for Cass County dismissing his complaint against Park West Gardens and Midwest Management. We reverse and remand.

On March 6, 1990, Hageman brought this action against Park West Gardens and Midwest Management for unpaid overtime compensation under the Fair Labor Standards Act, 29 U.S.C. section 201 et seq. An amended complaint was served on March 23, 1990, alleging, in addition, discriminatory discharge under the Act. After a bench trial,[1] the district court determined, among other things, that Hageman was an independent contractor and not an employee for purposes of the Act, and thus entered judgment dismissing Hageman's complaint with prejudice. This appeal followed.

In March of 1988, Hageman was hired as a maintenance person for the Park West Gardens apartment complex in West Fargo, North Dakota. Park West Gardens consists of 14 separate buildings and 144 apartments owned by a general partnership (Park West Partners). The apartment complex was, however, managed by a separate entity, namely Midwest Management, Inc.[2] Midwest replaced the former management company in August of 1988.

As a maintenance laborer, Hageman performed a variety of tasks including electrical, plumbing, heating and air conditioning repair, as well as general maintenance. He generally used his own tools, but Midwest purchased new tools for him when needed. In addition, Midwest provided Hageman with a $100 or $150 check to Menards each month for the purchase of supplies. Hageman could also charge some supplies at another hardware store. For his work, Hageman was paid $7 per hour. In addition, he received a $125 per month rent concession or credit on the rental of his apartment at Park West Gardens as well as a $10 per week gasoline allowance.

The work that Hageman performed usually started when a tenant made a request for repairs or maintenance to the resident manager of the apartment complex. The resident manager would then fill

---

1. After the trial, both parties submitted post-trial letter briefs addressing the applicable law under the Fair Labor Standards Act.

2. None of the parties seem to have differentiated between the action as against Park West Gardens versus that against Midwest Management. On remand, some differentiation may well be required. *See generally Falk v. Brennan,* 414 U.S. 190, 94 S.Ct. 427, 38 L.Ed.2d 406 (1973); *Haywood v. Barnes,* 109 F.R.D. 568, 584–592 (E.D.N.C.1986). Those issues are not appropriately before the Court and are not resolved by this opinion.

out a work order outlining the problem. Although Hageman had no set hours, he usually went to the office at Park West Gardens at approximately 10:00 a.m. daily to pick up the work orders. Additionally, Hageman was provided a voice pager, which was used to contact him in case of an emergency. After completing the work, Hageman filled out the form by indicating the work he had done, the materials used, the number of hours it took him, the date work was completed, and the amount due and affixed his signature. The form also required the signature of the resident manager before it could be forwarded to Midwest. Hageman, apparently, worked more or less under this arrangement for approximately two years.

## I. EMPLOYEE STATUS

■ On appeal, Hageman first argues that the trial court incorrectly applied the law respecting who is a covered employee under the Fair Labor Standards Act. We agree.[3]

The Fair Labor Standards Act was enacted in 1938 to combat the low wages and long working hours then endured by some laborers. As part of this remedial legislation, maximum working hours were established. 29 U.S.C. section 207(a)(1) states in relevant part:

"Except as otherwise provided in this section, no employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed."

Thus, those laborers that are deemed employees under the Act must be paid time and a half for hours worked over 40.

■ The term "employee" is defined under the Act as "any individual employed by an employer." 29 U.S.C. section 203(e)(1). An "employer" is defined as including "any person acting directly or indirectly in the interest of an employer in relation to an employee...." 29 U.S.C. section 203(d). "Employ" is defined as including "to suffer, or permit to work." 29 U.S.C. section 203(g).[4] Recognizing the remedial purpose of the Fair Labor Standards Act and similar legislation such as the Social Security Act, the United States Supreme Court while construing such terms has held that the common law distinctions between employees and independent contractors are not applicable. *United States v. Silk*, 331 U.S. 704, 713, 67 S.Ct. 1463, 1468, 91 L.Ed. 1757 (1947). Rather, the test is whether or not a worker is an employee as a matter of "economic reality." *Id.* *See also Goldberg v. Whitaker House Cooperative, Inc.*, 366

---

**3.** It appears that most federal courts faced with the question have concluded that the ultimate determination of whether or not a person is an employee, for purposes of the Act, is a conclusion of law and thus fully reviewable on appeal, but that the underlying individual findings of fact remain subject to the clearly erroneous standard. *See Dole v. Snell*, 875 F.2d 802, 805 (10th Cir.1989); *See also Brock v. Mr. W Fireworks, Inc.*, 814 F.2d 1042, 1044–1045 (5th Cir. 1987); *Donovan v. New Floridian Hotel, Inc.*, 676 F.2d 468, 471 n. 4 (11th Cir.1982); *Secretary of Labor, United States Department of Labor v. Lauritzen*, 835 F.2d 1529, 1535 (7th Cir.1987); *Donovan v. DialAmerica Marketing, Inc.*, 757 F.2d 1376, 1386 (3rd Cir.1985); *Bonnette v. California Health and Welfare Agency*, 704 F.2d 1465, 1469 (9th Cir.1983). As this standard applies to the so-called *Silk* factors, derived from *United States v. Silk*, 331 U.S. 704, 67 S.Ct. 1463,

91 L.Ed. 1757 (1947), the Court of Appeals for the Second Circuit stated:

"The existence and degree of each factor is a question of fact while the legal conclusion to be drawn from those facts—whether workers are employees or independent contractors—is a question of law. Thus, a district court's findings as to the underlying factors must be accepted unless clearly erroneous, while review of the ultimate question of employment status is *de novo*."

*Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1059 (2nd Cir.1988).

**4.** The United States Supreme Court, in *United States v. Rosenwasser*, 323 U.S. 360, 362, 65 S.Ct. 295, 296, 89 L.Ed. 301 (1945), while discussing the definitions in the Act noted that "[a] broader or more comprehensive coverage of employees ... would be difficult to frame."

U.S. 28, 33, 81 S.Ct. 933, 936, 6 L.Ed.2d 100 (1961).

■ In discerning the "economic realities" of a given working relationship, a number of factors, derived in part from *United States v. Silk*, 331 U.S. 704, 715, 67 S.Ct. 1463, 1469, 91 L.Ed. 1757 (1947), have developed. These factors include: "1) the nature and degree of the alleged employer's control as to the manner in which the work is to be performed; 2) the alleged employee's opportunity for profit or loss depending upon his managerial skill; 3) the alleged employee's investment in equipment or materials required for his task, or his employment of workers; 4) whether the service rendered requires a special skill; 5) the degree of permanency and duration of the working relationship; 6) the extent to which the service rendered is an integral part of the alleged employer's business." *Secretary of Labor, United States Department of Labor v. Lauritzen*, 835 F.2d 1529, 1535 (7th Cir.1987). However, "[t]hese factors are not exhaustive, nor can they be applied mechanically to arrive at a final determination of employee status." *Brock v. Mr. W Fireworks, Inc.*, 814 F.2d 1042, 1043 (5th Cir.1987). "Rather they must always be aimed at an assessment of the 'economic dependence' of the putative employees, the touchstone for this totality of the circumstances test." *Id.* The Fifth Circuit in *Brock*, quoting *Usery v. Pilgrim Equipment Company, Inc.*, 527 F.2d 1308, 1311–1312 (5th Cir.1976), further put it as follows:

"No one of these considerations can become the final determinant, nor can the collective answers to all of the inquiries produce a resolution which submerges the dominant factor—economic dependence.... The five tests are aids—tools to be used to gauge the degree of dependence of alleged employees on the business with which they are connected.

It is *dependence* that indicates employee status. Each test must be applied with that ultimate notion in mind. More importantly, the final and determinative question must be whether the total of the testing establishes the personnel are so dependent upon the business with which they are connected that they come within the protection of the FLSA or are sufficiently independent to lie outside its ambit. [Emphasis in original.]"

*Brock v. Mr. W Fireworks, Inc.*, 814 F.2d at 1044. Stated another way, the question is whether or not the factors demonstrate that the workers are "independent contractors in the 'critically significant' sense that they [are] 'in business for themselves.'" *McLaughlin v. Seafood, Inc.*, 867 F.2d 875, 877 (5th Cir.1989) (amending 861 F.2d 450 (5th Cir.1988)), quoting *Beliz v. W.H. McLeod & Sons Packing Co.*, 765 F.2d 1317, 1327–1328 (5th Cir.1985).[5]

## A. CONTROL

The first of the above-listed "economic reality" factors deals with "control." The trial court made the following findings which seem to address this factor:

"11. Hageman did all of his maintenance work on site at Park West Gardens. Although he was not restricted by the Defendants from doing outside work, Hageman had no other employment while at Park West Gardens.

\* \* \* \* \* \*

"24. None of the Defendants supervised Hageman or his work. There was no requirement that Hageman's work be inspected before he was paid.

"25. If Hageman could not do the work, it was within his discretion to notify Skaurud, who would then get someone else to do the job.

\* \* \* \* \* \*

---

**5.** Here we note that one must be careful not to confuse the federal standard for determining the difference between an independent contractor and an employee under the Fair Labor Standards Act, and various state laws involving this issue, *i.e., see Griffin v. North Dakota Workers Compensation Bureau*, 466 N.W.2d 148 (N.D. 1991) (workers compensation law); *Midwest Property Recovery, Inc. v. Job Service of North Dakota*, 475 N.W.2d 918 (N.D.1991) and *Turnbow, d/b/a Nodak Construction v. Job Service North Dakota*, 479 N.W.2d 827, 829 (N.D.1992) (unemployment compensation law, under former "ABC" test).

"31. Neither Midwest nor Park West Partners had direct control over Hageman. If Hageman failed to show up or do a particular job, the Defendants had no right to fire him. If Hageman's work was not satisfactory or was not done in a timely manner, the Defendants could choose to no longer use Mr. Hageman's services.

"32. Hageman was not told to report for work at any specific time each day.

"33. If Hageman did not pick up a work order or do a job on a particular day, Midwest would find someone else to do the job.

"34. The Defendants required no verification of Hageman's work hours.

"35. The Defendants did not inspect Hageman's work before he was paid for it. However, beginning in July, 1988, Midwest required the tenant to sign the work order to show the work was completed before Hageman turned the work order in for approval and payment.

\*   \*   \*   \*   \*   \*

"42. On occasion, Hageman used his son Mike to help move appliances or help make repairs. Hageman did not need the Defendants' prior approval to do so."

■ What is conspicuously missing from these findings regarding control and the trial court's ultimate decision is how this degree of control demonstrates Hageman's economic independence. Determining the degree of control an employer has over a worker is not an end in and of itself. Rather, determining the degree of control is only an aid "to be used to gauge the degree of dependence of the alleged employees on the business with which they are connected." *Usery v. Pilgrim Equipment Co., Inc.*, 527 F.2d at 1311. Control is thus "only significant when it shows an individual exerts such a control over a meaningful part of the business that she stands as a separate economic entity." *Usery v. Pilgrim Equipment Co., Inc.*, 527 F.2d at 1312–1313.

The trial court's findings that Hageman didn't need prior approval to have his son help him with the work, that the defendants didn't verify his work hours, that the

defendants didn't inspect his work before he was paid, and that Hageman was not required to show up for work at any set time do not significantly demonstrate under federal case law Hageman's economic dependence or independence. *See generally Castillo v. Givens*, 704 F.2d 181, 190 (5th Cir.1983) ("This Court has on several occasions found employment status even though the defendant-employer had no control over certain aspects of the relationship, *e.g.*, the right to set hours, hire and fire, or determine wages."); *Usery v. Pilgrim Equipment Co., Inc.*, 527 F.2d at 1312 (recognizing that the right to set one's own hours and hire employees is not always indicative of an independent contractor status); *Fahs v. Tree–Gold Co-op Growers*, 166 F.2d 40, 44 (5th Cir.1948) (holding that "contractors" were employees of defendant packing company even though the packing company had no right to control the number of employees, the hours worked, or their wages).

In finding of fact 11, the trial court found that Hageman was free to do outside work. However, "employees may work for more than one employer without losing their benefits under the FLSA." *Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1060 (2nd Cir.1988). Additionally, "[e]ven if the freedom to work for multiple employers may provide something of a safety net, unless a worker possesses specialized and widely-demanded skills, that freedom is hardly the same as true economic independence." *McLaughlin v. Seafood, Inc.*, 867 F.2d at 877.

There is nothing in the record to indicate that general apartment maintenance work is widely demanded. Also, as Hageman worked on a continuous basis exclusively at Park West Gardens for approximately two years, in economic reality his freedom to secure like work was "dependent upon finding employment in the business of others." *Id.*, quoting *Beliz v. W.H. McLeod & Sons Packing Co.*, 765 F.2d at 1327, quoting *Fahs v. Tree–Gold Co-op Growers*, 166 F.2d 40, 44 (5th Cir.1948).

The trial court, in findings of fact 25, 31, and 33, finds that Hageman was free to not

take work orders if he was so inclined, and that Midwest, in such a case, could simply get someone else to do the job.[6] However, these findings are not material in light of the federal legal standard we must apply, to-wit: "[i]t is not significant how one 'could have' acted under the contract terms." *Usery v. Pilgrim Equipment Co., Inc.*, 527 F.2d at 1312. Rather, "[t]he controlling economic realities are reflected by the way one actually acts." *Id. See also Brock v. Mr. W Fireworks, Inc.*, 814 F.2d at 1047. In this case, Hageman worked at Park West Gardens continuously for approximately two years. For his work he was given a rent concession for an apartment at Park West Gardens. In addition, he was given a voice pager so he could be reached in case of an emergency. These facts indicate that Hageman *actually* worked in a manner more consistent with a status of an employee rather than the status of an independent contractor. There can be little doubt that had Hageman started to regularly decline work orders for work he was qualified to perform at Park West Gardens, he would have likely lost both the rent concession and the right to receive work orders in the future.

■ In any case, even if we were to accept the trial court's findings, respecting Hageman's right to freely decline work,

this fact or conclusion alone doesn't demonstrate economic independence on Hageman's part under the Fair Labor Standards Act. The fact that a worker has discretion over whether or not he or she will work on any given day is not necessarily the same as true economic independence. *See, e.g., McLaughlin v. Seafood, Inc.*, 861 F.2d 450 (5th Cir.1988) (as amended by 867 F.2d 875 (5th Cir.1989)) (holding that backers, pickers, and peelers were employees even though the workers could, among other things, come and go as they pleased).

### B. OPPORTUNITY FOR PROFIT OR LOSS

The next factor often utilized as an aid in determining a worker's economic dependence deals with the worker's opportunity for profit or loss. In this respect, the trial court merely found that Hageman was paid $7 per hour, and that he "did as many work orders as he could per day."[7] However, the record indicates that Hageman had no real risk of suffering any loss. The expenses associated with the maintenance and general repairs were not borne by Hageman. Any reduction in Hageman's earnings would be due to "a loss of wages, and not of an investment." *Secretary of Labor, United States Department of Labor v. Lauritzen*, 835 F.2d at 1536. Like-

---

**6.** In finding of fact 31, the trial court states in relevant part:

"If Hageman failed to show up or do a particular job, the Defendants had no right to fire him. If Hageman's work was not satisfactory or was not done in a timely manner, the Defendants could choose to no longer use Mr. Hageman's services."

Although couched in terms of a factual finding, this is actually a conclusion of law under the federal analysis.

**7.** In finding of fact 27, the trial court states: "On Hageman's 1988 Federal Income Tax Return, he filed a Schedule C Profit or Loss from Business (See Defendants' exhibit 13), on which Hageman listed his business as 'service maintenance,' and claimed $5,085.00 in business deductions for advertising, bank service charges, car and truck expenses, depreciation, dues and publications, insurance, laundry and cleaning, and legal and professional services."

However, it is important to recognize that "[a]n employee is not permitted to waive employee status." *Robicheaux v. Radcliff Material, Inc.*,

697 F.2d at 667. As the court in *Robicheaux* explained:

"Thus, the fact that the plaintiff welders in this case signed contracts stating that they were independent contractors, while relevant, is not dispositive. Likewise, the fact that they provided their own insurance coverage, listed themselves as self-employed on their tax returns, and had their own business cards and letterheads, does not tip the balance in favor of independent contractor status where, as here, the economic realities of the situation indicate that the employee depended upon the employer for his livelihood. [Citations omitted.]"

*Id.* In addition, in this case, the trial court in its finding of fact noted that Hageman had requested around April of 1988 and again in September of 1988 that he be paid time and a half.

In any case, the deductions listed are not indicative of any significant investment of capital on Hageman's part nor are they indicative of any opportunity for profit or loss.

wise, the "only '"expenditures" from which [Hageman] [could] obtain a return [on] [was] [his] own labor.'" "Such returns are more properly 'classified as wages, not profits.'" "By contrast '"[p]rofit" is the gain realized from a business over and above its [capital] expenditures.'" *Brock v. Mr. W Fireworks, Inc.,* 814 F.2d at 1050–1051 quoting *Brock v. Lauritzen,* 624 F.Supp. 966, 969–970 (E.D.Wis.1985) quoting *Silent Woman, Ltd. v. Donovan,* 585 F.Supp. 447, 451 (E.D.Wis.1984).

## C. INVESTMENT

■ Somewhat interrelated with the opportunity for profit or loss factor is the investment factor. Although the trial court made no explicit finding regarding this factor, it did find that Hageman used his own vehicle and tools. However, the fact that a worker uses or provides his own tools is not itself indicative of independent contractor status. Rather, "[t]he [worker's] relative investment must be compared with the investment of [the putative employer] in order to determine the degree of economic dependence." *Brock v. Mr. W Fireworks, Inc.,* 814 F.2d at 1052. *See, e.g., Rutherford Food Corp. v. McComb,* 331 U.S. 722, 725, 67 S.Ct. 1473, 1474, 91 L.Ed. 1772 (1947), (holding that meat boners who owned their own boning knives, hooks, and leather belts were employees); *McLaughlin v. Seafood, Inc.,* 867 F.2d at 875 (holding that backers, pickers, and peelers that supplied their own hairnets, aprons, gloves, and seafood knives were employees); *Silent Woman, Ltd. v. Donovan,* 585 F.Supp. at 451 (holding that seamstresses who work at home and supplied their own sewing machines were employees); *Real v. Driscoll Strawberry Associates, Inc.,* 603 F.2d 748, 752 (9th Cir.1979) (holding that migrant workers who supplied their own shovels, clippers, handcarts, and hoes were employees); and *Secretary of Labor, United States Department of Labor v. Lauritzen,* 835 F.2d at 1537 (holding that pickle pickers that provided their own gloves were employees). In *Robicheaux v. Radcliff Material, Inc.,* 697 F.2d 662, 666 (5th Cir.1983), the Court of Ap-

peals stressed the trial court's analysis in this manner: "Although each of the welders had invested his own money in purchasing a welding machine, the district court concluded that a relatively minor portion of the compensation was paid to the employees based upon their furnishing their equipment and that the major part of the compensation was paid for the services of these ... employees."

In this case, the trial court found that Midwest purchased the supplies necessary for the general maintenance and repair, and even replaced Hageman's tools when needed. Also, the trial court did not find, and the record does not indicate, that any of Hageman's tools or his vehicle were in any way significant or unique. There is nothing in the trial court's findings nor in the record which would indicate that any "portion of the compensation ... paid to [Hageman] [was] based upon [his] furnishing [tools]...." *Robicheaux v. Radcliff Material, Inc.,* 697 F.2d at 666.

## D. SKILL

The next factor federal courts often utilize as an aid in determining a worker's economic dependence deals with the relative skill involved in the service rendered. Again, the trial court made no explicit findings regarding this factor other than to state that "Hageman's work involved various types of maintenance and repair including electrical, plumbing, keys and locks, heating and air conditioning, servicing and equipment, and general maintenance and repair." The trial court also noted that "no special training was provided by the Defendants" and that Hageman "relied on his own experience." As with the other factors, the mere presence of a high level of skill "is not itself indicative of independent contractor status." *Brock v. Superior Care, Inc.,* 840 F.2d at 1060. "Skills are not the monopoly of independent contractors." *Secretary of Labor, United States Department of Labor v. Lauritzen,* 835 F.2d at 1537. Many "skilled workers who do not *exercise significant initiative in locating work opportunities* have been held to be employees under the FLSA.

[Emphasis added.]" *Brock v. Superior Care, Inc.,* 840 F.2d at 1060, ("[t]he nurses in the present case possess technical skills but nothing in the record reveals that they used these skills in any independent way. Rather, they depended entirely on referrals to find job assignments...."); *Robicheaux v. Radcliff Material, Inc.,* 697 F.2d at 667 (noting that employee welders exercised little initiative and planning respecting their skills as welders). In this case, there is nothing to indicate that Hageman exercised "business-like initiative" in exploiting his skills. *See Donovan v. DialAmerica Marketing, Inc.,* 757 F.2d 1376, 1387 (3rd Cir. 1985). Hageman utilized his skills only on work orders he was provided at the site office at Park West Gardens. As noted earlier, the fact that Hageman "could have" worked for other people is not relevant. "The controlling economic realities are reflected by the way one actually acts." *Usery v. Pilgrim Equipment, Co., Inc.,* 527 F.2d at 1312.

### E.  PERMANENCY AND DURATION

The next factor often used as a tool in determining a worker's degree of economic dependence deals with the degree of permanency and duration of the working relationship. The trial court determined that Hageman had worked at Park West Gardens from March of 1988 until March of 1990. The trial court further noted that Hageman did not do outside work. Traditionally, " '[i]ndependent contractors' often have fixed employment periods and transfer from place to place as particular work is offered to them, whereas 'employees' usually work for only one employer and such relationship is continuous and of an indefinite duration." *Dole v. Snell,* 875 F.2d 802, 811 (10th Cir.1989). In considering permanency and duration as they relate to the degree of a worker's economic dependence, we find the following language in *Robicheaux* relevant:

"While some of the welders may have been independent contractors for other companies before commencing work with Radcliff, this fact does not preclude a finding that they exchanged this status for the security of the present employee relationship. They thereby obtained the *benefit of steady reliable work over a substantial period of time and became economically dependent on a single source of income.*"

*Robicheaux v. Radcliff Material, Inc.,* 697 F.2d at 667 (emphasis added). However, "[e]conomic dependence is *not* [necessarily] conditioned on reliance on an alleged employer for one's primary source of income, for the necessities of life." *Brock v. Mr. W Fireworks,* 814 F.2d at 1054 (emphasis in original). "Rather, the proper test ... 'examines whether the workers are dependent on a particular business or organization *for their continued employment.*'" *Id.,* quoting *Donovan v. DialAmerica Marketing, Inc.,* 757 F.2d at 1385 (emphasis in original). In this case, after working exclusively at Park West Gardens for approximately two years, Hageman became dependent upon Park West Gardens/Midwest Management for his continued employment as well as his livelihood.

### F.  INTEGRAL PART OF THE BUSINESS

The last factor often used while considering a worker's degree of economic dependence deals with the extent to which the service rendered is an integral part of the alleged employer's business. When asked what the management agreement between Midwest and the Park West Gardens partnership provided, Brad K. Holm, Midwest vice president, stated it "[p]rovides the management company the ability to oversee the day-to-day activities such as the renting, advertising for available units, repairs, maintenance work that needed to be done, and so that we would take care of those types of functions so that the owners themselves did not become involved to that extent." The overlap between Midwest's responsibilities and Hageman's job duties is significant. Although not conclusive, this suggests that there are not two separate economic entities, and thus that Hageman is economically dependent on Midwest. *See generally Rutherford Food Corp. v. McComb,* 331 U.S. at 726, 67 S.Ct. at 1475; *Dole v. Snell,* 875 F.2d at 811; compare *Brown v. North Dakota Workmen's Com-*

*pensation Bureau,* 152 N.W.2d 799 (dealing with a similar inquiry under workers compensation law) (N.D.1967).

## II. SUMMARY: INDEPENDENT CONTRACTOR VS. EMPLOYMENT

After considering the various relevant "economic reality" factors, pursuant to federal standards under the Fair Labor Standards Act as construed by the federal courts, we conclude that Hageman was an employee, not an independent contractor.

## III. DISCRIMINATORY DISCHARGE

■ The Fair Labor Standards Act "prohibits discrimination against an employee who asserts or threatens to assert his or her FLSA rights." *Brennan v. Maxey's Yamaha, Inc.,* 513 F.2d 179, 180 (8th Cir. 1975). In *Brennan,* we note the following relevant discussion:

"Where the immediate cause or motivating factor of a discharge is the employee's assertion of statutory rights, the discharge is discriminatory under [29 U.S.C.] § 215(a)(3) whether or not other grounds for discharge exist. *Goldberg v. Bama Manufacturing Corp.,* 302 F.2d 152 (5th Cir.1962); *Mitchell v. Goodyear Tire & Rubber Co.,* 278 F.2d 562 (8th Cir.1960). In the *Mitchell* case we reversed as clearly erroneous the trial court's finding that an employee's discharge was unrelated to his mailing a letter of complaint to the Wage and Hour Division of the Department of Labor a few days earlier. On the contrary, the record revealed that *although a few days before his wage-hour complaint he had been scheduled for future discharge, he would not have been discharged at that particular time but for his admission of authorship of the letter.* Similarly, in *Goldberg* the Fifth Circuit remanded the trial court's refusal to grant reimbursement of lost wages to an employee who *could have, and in the court's opinion, 'probably ought' to have been fired for half a dozen reasons, where the firing was motivated in part by the assertion of her statutory*

*rights.* 302 F.2d at 153. [Emphasis added]."

*Id.,* at 181. Thus, where an employee is fired and the termination is motivated in any part by the employee's assertion of rights under the Act, such termination is deemed discriminatory.

■ In this case, the trial court made the following relevant findings of fact:

"8. In January, 1990, Hageman told Lori Larson, an assistant resident manager at Park West Gardens, that he was going to file a claim against the Defendants. In March 1990, Larson was instructed not to write up work orders for Hageman *because of the lawsuit.*

"9. After Hageman served the Summons and Complaint in this action, he was told by the Defendants, or their agents, that he would not be getting any more work orders.

"10. Some of the residents at Park West Gardens did not like Hageman. The Defendants received some complaints about Hageman.

\* \* \* \* \* \*

"19. On March 6, 1990, Hageman served the Summons and Complaint in this action because the statute of limitations is two years and he did not feel he was getting anywhere with the Defendants. Hageman went to the Park West Gardens office that morning and every morning thereafter for two weeks and was told by Barb Skaurud that there was no work for him. On March 9, 1990, Skaurud told Hageman there was no work *because he had sued them.* Hageman received no written termination notice from the Defendants.

\* \* \* \* \* \*

"38. The Defendants' decision in March, 1990, *to discontinue Hageman's services* at Park West Gardens was based on a number of complaints received from tenants about Hageman or his work and the fact that Midwest had other people available to do the repair and maintenance work. This decision was not retaliatory as a result of Hage-

man's lawsuit against the Defendants. [Emphasis added.]"

Additionally, the trial court stated, in its conclusions of law, "the Defendants' decision to discontinue using Hageman for repair and maintenance services was not retaliatory and is not a wrongful discharge in violation of the Fair Labor Standards Act."

What is significant in finding of fact 38 as well as the trial court's ultimate conclusion is the way it characterizes the termination as a "decision to discontinue Hageman's services." This choice of language suggests that the trial court's findings may have been dependent on its erroneous conclusion that Hageman was an independent contractor. Given this fact and the otherwise seeming inconsistencies in the trial court's findings, we conclude that this issue of discrimination must be remanded for additional findings consistent with this opinion.

## IV. CONCLUSION

In summary, we conclude that under the "economic realities" test for employment under the Fair Labor Standards Act, that Hageman is an employee as distinguished from an independent contractor. Because the trial court's conclusion respecting Hageman's discriminatory discharge claim was predicated upon the erroneous determination that Hageman was an independent contractor, the issue of discrimination must be remanded. As the remaining issues raised by the parties dealing with the issue of liquidated damages, attorney's fees, and the issue of whether or not the employment was in interstate commerce were not addressed by the trial court,[8] on remand they should be decided by the trial court.

For the aforementioned reasons, the judgment of the district court is reversed and remanded. Upon remand, the district

---

8. 29 U.S.C. § 203(s)(1) provides, in part:

"(s)(1) 'Enterprise engaged in commerce or in the production of goods for commerce' means an enterprise that—
(A)(i) has employees engaged in commerce or in the production of goods for commerce, or that has employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person; and
(ii) is an enterprise whose annual gross volume of sales made or business done is not less than $500,000 (exclusive of excise taxes at the retail level that are separately stated);"
29 U.S.C. § 215(a)(3) provides:
"(a) ... it shall be unlawful for any person—
"(3) to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter, or has testified or is about to testify in any such proceeding, or has served or is about to serve on an industry committee;"
29 U.S.C. § 216(b) provides, in part:
"(b) Any employer who violates the provisions of section 206 or section 207 of this title shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages. Any employer who violates the provisions of section 215(a)(3) of this title shall be liable for such legal or equitable relief as may be appropriate to effectuate the purposes of

section 215(a)(3) of this title, including without limitation employment, reinstatement, promotion, and the payment of wages lost and an additional equal amount as liquidated damages. An action to recover the liability prescribed in either of the preceding sentences may be maintained against any employer (including a public agency) in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated. No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought. The court in such action shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and costs of the action."
29 U.S.C. § 260 provides:
"In any action commenced prior to or on or after May 14, 1947 to recover unpaid minimum wages, unpaid overtime compensation, or liquidated damages, under the Fair Labor Standards Act of 1938, as amended [29 U.S.C. 201 et seq.], if the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the Fair Labor Standards Act of 1938, as amended, the court may, in its sound discretion, award no liquidated damages or award any amount thereof to exceed the amount specified in section 216 of this title."

court may conduct such further evidentiary proceedings, hear such legal arguments, and make such findings and determinations as are necessary to resolve all issues in this lawsuit.

VANDE WALLE, MESCHKE, JJ., and DOUGLAS B.HEEN and VERNON R. PEDERSON, Surrogate Judges, concur.

DOUGLAS B. HEEN, Surrogate Judge, sitting in place of LEVINE, J., disqualified.

VERNON R. PEDERSON, Surrogate Judge, sitting with the Court due to the resignation of the Honorable H.F. Gierke III, as of November 20, 1991.