**Rex BAKER, Joseph N. Bordelon, Alan Boyd, Charlie E. Bradshaw, Jr., William R. Clarence, Gary Coon, Robert Cornett, Jr., Larry Cunningham, Denny Hensley, Steven D. Hensley, Leonard L. Mahan, Mack D. Mantle, Tracy R. McManus, Eddie Miller, Gerald Miller, David L. Robinson, James D. Spears, Jr. and Dennis Stiles, Plaintiffs,**

v.

**BARNARD CONSTRUCTION CO. INC., Davy McKee Corp., Flint Engineering & Construction Co., Four–Four, Inc., Four–Way Company, Inc., Foutz & Bursum Construction Co., Inc., Mountain West Fabrication Plants & Stations, Inc., Pioneer Contracting Company, Inc. and Tic–The Industrial Company, Defendants.**

**Civ. No. 93–0140 JB.**

United States District Court,
D. New Mexico.

May 24, 1994.

---

J.E. Gallegos and David Sandoval, Santa Fe, NM, for plaintiffs.

Richard A. Winterbottom, Stout & Winterbottom, Albuquerque, NM, Thomas J. Hynes, Farmington, NM, James L. Brown, Farmington, NM, Nicholas J. Noeding, Hinkle, Cox, Eaton Coffield & Hensley, Albuquerque, NM, John Schmidt & Deirdre I. Dexter, Conner & Winters, Tulsa, OK, David C. Davenport, Jr., Rodey, Dickason, Sloan, Akin & Robb, Santa Fe, NM, Gregory K. Hoskin & John T. Howe, Nelson, Hoskin & Farina, Grand Junction, CO, Dan A. McKinnon, III, Marron, McKinnon & Ewing, Albuquerque, NM, Victor A. Titus, Titus & Gurley, Farmington, NM, Michael A. Ross, TIC Holdings, Inc., Steamboat Springs, CO, Lisa Enfield, David A. Rammelkamp, Kelly, Rammelkamp, Muehlenweg, Lucero & Ewing, George McFall, Modrall, Sperling, Roehl, Harris & Sisk, Albuquerque, NM, Judith B. Stouder, Stoel, Rives, Boley, Jones & Grey, Seattle, WA, Gail Gottlieb & Jean M. Bannon, Sutin, Thayer & Browne, Albuquerque, NM, for defendants.

## MEMORANDUM OPINION AND ORDER

BURCIAGA, Chief Judge.

THIS MATTER is before the Court on Defendant Pioneer Contracting Company's (Pioneer) August 31, 1993, motion for summary judgment, Defendant Flint Engineering & Construction Company's (Flint) September 28, 1993, motion for summary judgment, and Plaintiffs' September 1, 1993, motion for summary judgment against Pioneer and Flint. Plaintiffs claim the Defendants violated the Fair Labor Standards Act (FLSA) by failing to pay them overtime compensation at one-and-a-half times the "regular rate." Defendants claim Plaintiffs are not entitled to overtime compensation because they are "independent contractors" and, thus, not "employees" under the FLSA. This matter having come on for an evidentiary hearing on January 13, 14 and 24, 1994, to resolve this factual dispute between the parties, and the Court having adduced evidence and being otherwise fully advised in the premises, makes the following findings of fact and conclusions of law.

1. The Court denied Defendant Davy McKee Corporation's motion to dismiss based on the Court's lack of personal jurisdiction. *Baker v. Barnard*

*Construction Co.*, Civ. No. 93–140 JB (D.N.M. filed Sept. 15, 1993).

### Findings of Fact

1. Aside from Defendant Davy McKee Corporation, the Defendants have not contested the Court's in personam jurisdiction,[1] and 29 U.S.C. § 216(b) (1990) confers subject-matter jurisdiction over Plaintiffs' claims. Therefore, the Court has personal and subject-matter jurisdiction over the parties and the cause of action.

2. Pioneer and Flint are general contractors hired by oil and gas companies to build natural gas "gathering systems" or "transmission systems." Transmission systems are made up of gas pipelines and compressor stations which transport natural gas from the wellhead to the owner's main processing plant.

3. Plaintiffs are highly skilled welders who supply their own welding equipment which is mounted on flat bed pick-up trucks. The vehicles are called "welding rigs" and the Plaintiffs are classified as "rig welders" within the business.

4. Pioneer, unlike Flint, bids on home construction and sewer and water projects as well as transmission systems projects. In the past 18 months, Pioneer built four houses and performed two home remodeling jobs. There was no evidence presented that Pioneer has done any other projects unrelated to transmission systems construction. Pioneer is a small company by industry standards, employing between 60 and 150 workers at any one time.

5. Over 240 rig welders signed up for potential employment opportunities with Pioneer in 1993. Pioneer hired only 12 rig welders in 1993. In a typical year, however, Pioneer hired between 20 and 30 rig welders. No evidence was produced on how many rig welders were hired in recent years by Flint. However, Flint is a national company which is engaged in numerous transmission systems projects at any one time.

6. Rig welders work for Pioneer and Flint for as little as one day and up to seven months on a transmission systems project. The average time a rig welder spends on a

Pioneer project is four weeks. The average time a rig welder spends on a Flint project is six weeks. This amounts to approximately 30 percent of the entire time Pioneer and Flint spend on a transmission systems project. Rig welders typically work a six-day work week and a ten-hour work day. It is not uncommon for a rig welder to work up to 12 hours in a single day or more than 70 hours in a work week. Rig welders work for numerous companies during the year and it is not uncommon for a rig welder to work for the same company on more than one occasion during a twelve month period. Rig welders obtained work by either placing their names on a sign up sheet with a company or by driving around to job sites to inquire about the need for welding work.

7. Before a rig welder can begin to work for Flint, they must sign a written agreement which states that they are hired by Flint as independent contractors. No such requirement is made by Pioneer, although Pioneer does not bargain over whether rig welders can be hired as independent contractors or employees. In fact, Flint's rig welders were not consulted before Flint changed their status from independent contractors to employees in July, 1991 (See Court's finding of fact number 13, *supra*). If a rig welder wants to work for Pioneer they must accept Pioneer's requirement that they work as independent contractors. Flint and Pioneer do not receive bids from rig welders to do welding on a per project basis. Both Flint and Pioneer pay an hourly rate for both the rig welders labor and their equipment. Neither Pioneer nor Flint has a practice of investigating whether rig welders have contractors' licenses, state business licenses or gross receipts tax numbers.

8. Pioneer and Flint paid rig welders $27.00 an hour for labor and equipment. Rig welders were responsible for purchasing all welding supplies and to stock their welding rigs before arriving at the job site. It was also the rig welders' responsibility to purchase all necessary insurance. Pioneer and Flint supplied the rig welders with a "welder's helper" and often times would comply with a rig welder's request for a specific helper. Rig welders are not required to perform non-welding tasks at the job site. Rig welders are the most skilled individuals on a construction site.

9. Rig welders must take a welding test, administered by the project owner, before they can be certified to work on a project. Pioneer and Flint have no input to whether a rig welder is certified. Further, Pioneer and Flint do not have certified welder's foremen on the job site and they do not check rig welders' work. The project owner hires inspectors whose job it is to check whether a weld is satisfactory. Inspector's do not have to be certified welders. It is also the inspector's job to check other aspects of the job site which includes inspecting the work by individuals hired by Pioneer and Flint as employees. Further, if an inspector has a problem with a rig welder, he goes to Pioneer's or Flint's respective supervisor on the job site.

10. Flint has a welder foreman on each project who is in charge of supervising the rig welders. Pioneer has no specific foreman supervising the rig welders. However, Chuck Tillotson, Field Superintendent of Pioneer, and Jose Aldaz, pipe welder foreman for Pioneer, exercised supervisory control over the rig welders. In fact, Aldaz fired Plaintiff Rex Baker for failing to "weld the way they wanted me to." Tillotson also has the authority to fire rig welders.

11. Both Pioneer and Flint exercise control over when the rig welders report to the job site each day, when they were permitted to take breaks, and when they could leave at the end of the day. Pioneer and Flint also exercised complete control over the coordination of the welding work, telling the rig welders what to weld and when to do it.

12. No potential exists for a rig welder to increase his pay by taking initiative on the job site. In fact, if a weld is unsatisfactory, a rig welder is not required to repeat the weld on his own time. Therefore, the only potential loss for a rig welder for doing poor work is to lose his job.

13. The average rig welder has approximately $30,000 invested in his welding rig. Pioneer often had no more than $40,000 to $80,000 invested in equipment on the construction site. There was no testimony from

Flint on this point, but it appears from the record that Pioneer's calculations are considerably lower (almost incredibly so) than the average cost of equipment used on a transmission systems project. Rig welders filed tax returns as self-employed. There was no evidence presented that rig welders used their equipment or welding skills to gain employment outside the oil and gas industry.

14. Pioneer is the only oil and gas contractor which presently treats rig welders as independent contractors in the Four Corners region.[2] Flint treated rig welders as independent contractors until July, 1991. Companies which treat rig welders as employees exercise the same level of supervision as Pioneer and Flint. In fact, the status of the rig welders did not change when Flint began treating rig welders as employees in July, 1991. Their pay, work duties and supervision after July, 1991, is indistinguishable from their pay, work duties and supervision prior to July, 1991.

15. Rig welders were the only independent contractors hired by Pioneer. All other work on a project was done "in house." Flint hired independent contractors other than rig welders, but only rig welders were paid by the hour.

16. Pioneer treated rig welders as employees on their accounting books. They computed overtime hours by the rig welders at one and a half times their regular pay in computing costs on a project. Pioneer at times charged its customers an overtime rate and holiday pay on rig welders hours although rig welders were never paid overtime or holiday pay by Pioneer. Flint also charged its customers overtime and holiday pay for rig welders based on their schedule of costs distributed to potential customers. There was no evidence presented that Flint treated rig welders as employees on their accounting books.

### Conclusions of Law

■ Under the FLSA, the definition of employee is broad. *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 728, 67 S.Ct. 1473,

1475, 91 L.Ed. 1772 (1947). When determining whether an individual is an employee or independent contractor, the court is not restricted to common law concepts. *Dole v. Snell*, 875 F.2d 802, 804 (10th Cir.1989). Rather, the FLSA "contains its own definitions, comprehensive enough to require its application to many persons and working relationships which, prior to this Act, were not deemed to fall within an employer-employee category." *Walling v. Portland Terminal Co.*, 330 U.S. 148, 150–51, 67 S.Ct. 639, 640, 91 L.Ed. 809 (1947) (citing *United States v. Rosenwasser*, 323 U.S. 360, 362–63, 65 S.Ct. 295, 296–97, 89 L.Ed. 301 (1945)). The focal point of the inquiry is "whether the individual is economically dependent on the business to which he renders service or is, as a matter of economic fact, in business for himself." *Dole*, 875 F.2d at 804 (citing *Bartels v. Birmingham*, 332 U.S. 126, 130, 67 S.Ct. 1547, 1549, 91 L.Ed. 1947 (1947)). In making this determination, the courts generally apply the following five factors: "(1) the degree of control exerted by the alleged employer over the worker; (2) the worker's opportunity for profit or loss; (3) the worker's investment in the business; (4) the permanence of the working relationship; and (5) the degree of skill required to perform the work." *Dole*, 875 F.2d at 805 (quoting *Doty v. Elias*, 733 F.2d 720, 723 (10th Cir.1984)); *United States v. Silk*, 331 U.S. 704, 716, 67 S.Ct. 1463, 1469, 91 L.Ed. 1757 (1947). The Tenth Circuit has approved the use of a sixth factor, which focuses on whether the individual's work is an integral part of the employer's business. *Dole*, 875 F.2d at 805; *Shultz v. Mistletoe Express Service, Inc.*, 434 F.2d 1267 (10th Cir.1970). However, the above factors are not to be considered in isolation, but are to be used by the Court as a tool for determining the totality of the circumstances regarding the economic reality of the working relationship. *Dole*, 875 F.2d at 805 (citing *Rutherford Food*, 331 U.S. at 730, 67 S.Ct. at 1476).

■ In applying the first *Silk* factor, the Court is to focus on whether the indepen-

---

**2.** The Four Corners region consists of the contiguous border area formed by Arizona, Utah, Colorado and New Mexico. Plaintiffs' claims against Pioneer and Flint regard construction projects in New Mexico's San Juan Basin of the Four Corners region.

dence, exercised by these Plaintiffs, is characteristic of someone in business for himself. *See Dole*, 875 F.2d at 808. The Defendants argue that their lack of supervision over the "method and manner" of the welding work is indistinguishable from *Carrell v. Sunland Construction, Inc.*, 998 F.2d 330 (5th Cir. 1993), where the court found that this fact was consistent with independent contractor status. *Id.* at 332–33. Plaintiffs contend the legal conclusion drawn in *Carrell* is inconsistent with *Robicheaux v. Radcliff Material, Inc.*, 697 F.2d 662 (5th Cir.1983) and Tenth Circuit precedent. *Dole*, 875 F.2d at 805.

In *Carrell*, the court found that the company's paying the welders an hourly wage, which was rarely negotiable, requiring the welders to work specific hours and assigning them to specific work tasks and crews was consistent with finding the welders to be employees. *Id.* at 332–33. However, the court found the fact that the company exercised little or no control over the welders cut against finding the welders employees of the defendant company. *Id.* at 332–33. Specifically, the court found important that the project owner, rather than the alleged employer, tested and certified the welders before they could work on a job site, the project owner hired inspectors to supervise the welders and the project owner could unilaterally fire a welder. *Id.* The court also relied on the parties' stipulation that the company "had no control over the manner or method of the pipe welding." *Id.* at 332. This finding was pivotal in the court's concluding that pipeline welders were independent contractors. *Id.* at 334.

In *Robicheaux*, there was no evidence of third-party control over a very different type of welder than those in *Carrell*. *Robicheaux*, 697 F.2d at 666 (welders were only moderately skilled, only approximately fifty percent of their work for the defendant was welding work, and the plaintiffs worked primarily for one employer year-round). However, the court found the fact that the employer "exercised substantial if not complete control over the hours worked and the jobs done by the welders," was consistent with employee status. *Id.* In *Dole*, the court found cake

decorators to be employees of the bakery operation they worked for. In applying the control factor, the court said that "[i]t is virtually impossible to look upon these individuals as having the independence which characterizes a person conducting their own business." *Dole*, 875 F.2d at 808. In concluding the decorators did not have the independence consistent with independent contractors, the court found that the alleged employer controlled the decorators hours of work and the quality of their work. *Id.* at 806. The court did not attach any significance to the fact the decorators' worked without direct supervision because the owner of the business was usually on the premises and she exercised control over the finished product. *Id.*

In this case the rig welders were supervised as to their hours of work, work crews and work duties. The rig welders were not told how to burn a welding rod. In *Carrell*, the court appeared to give great weight to the fact the welders were not supervised as to the "manner or method of the pipewelding." *Id.* at 332–33, 334. This finding, which was stipulated to between the parties, is of dubious significance in determining a worker's independence. One would not say that a secretary has independence consistent with independent contractor status simply because his supervisor does not tell him how to type. A laborer on a construction site, who is told where and when to dig, does not exhibit characteristics of an independent contractor if the company does not actually tell him how to use a shovel. In *Dole*, the court did not find it significant that the bakery did not tell the cake decorators how to decorate a cake in finding that the bakery exercised pervasive control over the decorators. *Dole*, 875 F.2d at 806. It was enough that the alleged employer was always on the job site and that she rejected finished cakes deemed unsatisfactory. *Id.* at 806. In this case, the Defendants always had an employee at the job site who had supervisory control over the rig welders. The Court also finds relevant the fact that when the Plaintiffs work for other companies in the region, they are classified as employees.[3] However, their supervision,

---

**3.** This is a class-action lawsuit against eight com-

panies in the Four Corners region for violations

when working for these other companies, does not change. It is also significant that when Flint changed the rig welders status to employees in July, 1991, its supervision of the Plaintiffs has also not changed.

Defendants argue that the project owners, and not the Defendants, had the sole right to test and certify the welders and to check their work product as evidence of their lack of control over the rig welders. The fact the Defendants shared supervision with the project owner is not helpful in determining the independence of the Plaintiffs. *Brock v. Mr. W Fireworks, Inc.*, 814 F.2d 1042, 1049 (5th Cir.), *cert. denied*, 484 U.S. 924, 108 S.Ct. 286, 98 L.Ed.2d 246 (1987) (quoting *Usery v. Pilgrim Equip. Co.*, 527 F.2d 1308, 1312–13 (5th Cir.), *cert. denied*, 429 U.S. 826, 97 S.Ct. 82, 50 L.Ed.2d 89 (1976)) ("Control is only significant when it shows an individual exerts such a control over a meaningful part of the business that she stands as a separate economic entity."). *Carrell* is inconsistent with prior Fifth Circuit precedent which focused on the amount of independence of the alleged employees rather than the amount of control by the alleged employer. From the viewpoint of the rig welders, they are no more independent simply because the Defendants contracted away some of their supervisory responsibilities. In fact, the shared supervision by the project owner is more suggestive that the rig welders may have had two employers rather than none. *See Castillo v. Givens*, 704 F.2d 181, 188 (5th Cir.), *cert. denied*, 464 U.S. 850, 104 S.Ct. 160, 78 L.Ed.2d 147 (1983).

Further, the Court's factual findings of the project owners' inspectors is significantly different than the findings made in *Carrell*. While the inspectors were solely responsible for approving the work of the Plaintiffs, the inspectors also were solely responsible for checking the work of other work crews on the job site who were considered employees by the Defendants. In *Carrell*, there was no finding on the scope of the inspectors' duties regarding workers who were classified as employees. The *Carrell* court also attached

significance to the fact that the inspectors could unilaterally remove the welders. *Carrell*, 998 F.2d at 333. The facts before the Court suggest a less expansive role in supervising the rig welders by the inspectors. Clarence Williams, Kenneth Luther and Arville Buford Wheeler, who are currently or have been project inspectors, all testified that if they had a problem with a rig welder they went to the Defendants' job foreman. Luther testified that inspectors do not give welders directions or orders. Although there was testimony that the inspectors could fire a rig welder, there was no testimony that an inspector had ever fired, or unilaterally removed a rig welder, from a job site.

■ The Court also finds the fact that the Plaintiffs knew they were treated as independent contractors, and the fact they listed themselves as such on their tax forms, to be of little, if any, relevance. *Cf. Robicheaux*, 697 F.2d at 668 (citing *Usery*, 527 F.2d at 1315) ("[T]he fact that the plaintiff welders in this case signed contracts stating that they were independent contractors, while relevant, is not dispositive."). An employee is not permitted to waive employee status. *Donovan v. American Airlines, Inc.*, 686 F.2d 267, 269 n. 3 (5th Cir.1982) (citing *Barrentine v. Arkansas–Best Freight System*, 450 U.S. 728, 739, 101 S.Ct. 1437, 1444, 67 L.Ed.2d 641 (1981)). Plaintiffs did not have any ability to negotiate whether they were to be treated as independent contractors or employees. In fact, as to Pioneer, the Court finds credible the testimony that some of the Plaintiffs attempted to have their status changed to employees but were told by Pioneer Vice President Eric Cahenzli that if that was their condition for employment, Pioneer did not need their services. Further, when Flint reclassified Rig Welders in July, 1991, the rig welders were not consulted about this change. There was no evidence presented that any of the Plaintiffs were upset about being reclassified as employees. Therefore, it is clear that the Plaintiffs treating themselves as independent contractors on their tax forms was a reaction to the Defendants

---

of the FLSA. Defendants Barnard Construction Co., Inc., Davy McKee Corp., Four–Four, Inc., Four–Way Company, Inc., Foutz & Bursum Construction Co., Inc., and Mountain West Fabrication Plaints & Stations, Inc., all treat rig welders as employees.

non-negotiable policy. The Court finds more relevant the fact that the Defendants, who unilaterally determined the status of the rig welders, held the Plaintiffs out to their customers as employees. *See Brock v. Superior Care, Inc.,* 840 F.2d 1054, 1059 (2d Cir.1988) (citing *Halferty v. Pulse Drug Co.,* 821 F.2d 261, 268 n. 5 (5th Cir.), *modified by,* 826 F.2d 2 (5th Cir.1987)) ("[A]n employer's admission that his workers are employees covered by the FLSA is highly probative.").

Finally, the Court finds no evidence that the rig welders offered their services to third parties on a regular basis. The Court questions the credibility of Plaintiff Dan Spears, who testified that Dan's Welding was a "friend's business." Even accepting that Spears offered his welding services to the public, there is no evidence that any other rig welder did. "Under these circumstances we apply the rule that[:] 'it is not what the workers *could* have done that counts, but as a matter of economic reality what they actually *do* that is dispositive.'" *Dole,* 875 F.2d at 808 (quoting *Mr. W Fireworks,* 814 F.2d at 1047) (emphasis in original). Therefore, the Court finds that the Defendants' degree of control over the rig welders, and the Plaintiffs' lack of independence over setting their work hours, work crews and other details of their welding work, is more consistent with employee rather than independent contractor status.

The second *Silk* factor involves determining whether the worker has the opportunity to realize a profit, or to experience a loss, which would be consistent with independent contractor status. Defendants claim that Plaintiffs' tax returns illustrate that the Plaintiffs' ability to control their costs and their ability to "hustle" new work is significant in their year-end income and, therefore, consistent with finding the Rig Welders independent contractors. *Carrell,* 998 F.2d at 334. Plaintiffs argue that because they were paid a fixed hourly wage for both their labor and equipment, they could not make a "profit" or experience a "loss" under this factor. *Mr. W Fireworks,* 814 F.2d at 1050–51.

The courts have defined "profit" as "the gain realized from a business over and above its expenditures." *Brock v. Lauritzen,* 624 F.Supp. 966, 968 (E.D.Wis.1985), *aff'd,* 835 F.2d 1529 (7th Cir.1987), *cert. denied,* 488 U.S. 898, 109 S.Ct. 243, 102 L.Ed.2d 232 (1988). The courts have made it clear that "profit" does not include the different compensation levels workers may earn working on a piece-rate basis. *Dole,* 875 F.2d at 809 (citing *Rutherford Food,* 331 U.S. at 730, 67 S.Ct. at 1476; *Mr. W Fireworks, Inc.,* 814 F.2d at 1050–51; *Usery,* 527 F.2d at 1313). The proper analysis is to determine whether the worker "undertake[s] the risks usually associated with an independent business." *Dole,* 875 F.2d at 810.

The facts in this case make it clear the Plaintiffs had no opportunity to experience a profit or loss consistent with the characteristics of being independent businessmen. Plaintiffs were paid a fixed hourly rate. They had no opportunity to experience a loss on the job site. In fact, if one of their welds was inadequate, they did not have to repeat the weld on their own time. Thus, the Defendants assumed the only risk a rig welder undertook on the job site. Defendants submitted tax returns, filed by the Plaintiffs, to illustrate that the Plaintiffs' ability to control their costs is instrumental in their overall year end income. *Carrell,* 998 F.2d at 334. While there was no evidence submitted on what percentage of a rig welders' expenses went to welding rod, fuel and other maintenance of the welding rig, the Court does not doubt that rig welders who did not waste materials and who shopped around for these items increased their actual income at the end of the year. However, this also holds true for every worker, whether independent contractor or employee. The automobile mechanic who takes good care of his tools and the salesclerk who gets a bargain on his work clothes all have more money in their pocket at the end of the year than a more careless and less discriminating worker. However, the sales clerk did not make more "profit" based on his shopping prowess. Further, reviewing the rig welders' tax returns probably suggests more about their creative accounting methods (or lack thereof) than it

does about their ability to control their costs.[4]

Finally, the Court rejects the argument that because Plaintiffs must move from job site to job site many times during the year, that their ability to "hustle" new work is consistent with independent contractor status. One who hustles to find a new job is not making more "profit" than his less industrious counterpart. If maximizing one's labor was synonymous with "profit" under this factor, workers who are paid on a piece-meal basis would also be said to be making a "profit." However, in *Dole*, the court rejected the argument that maximizing one's wages on a piece work basis is consistent with making a profit. *Dole*, 875 F.2d at 809. The Court finds that the Plaintiffs had no ability to experience a profit or realize a loss and, therefore, this factor supports the conclusion the rig welders are employees rather than independent contractors.

The third *Silk* factor looks at the amount the alleged employees have invested in the business. The Defendants claim this factor is consistent with finding the rig welders independent contractors because the Plaintiffs have a significant investment in their welding rigs and a significant portion of their compensation is for providing this special equipment. Plaintiffs' argue that although their investment in their welding rigs is significant, it still must be compared to the Defendants' investment to determine whether the investment is consistent or inconsistent with economic dependence. *Mr. W Fireworks*, 814 F.2d at 1052.

■ In applying the investment factor, counts must compare the investment of the alleged employee with that of the alleged employer in the industry. *Dole*, 875 F.2d at 810. The investment that courts are to consider under this factor "is the amount of large capital expenditures, such as risk capital and capital investments, not negligible items, or labor itself." *Id.* at 810. Another consideration in this equation is to focus on whether the alleged employees' investment in

the business significantly effects the amount of compensation he receives. *Robicheaux*, 697 F.2d at 666. In *Dole*, the court compared the approximate $400 a year investment by the decorators with the company's overall investment in their bakery business and concluded that the decorators investment in their own tools "simply [did] not qualify as an investment in [the] business." *Dole*, 875 F.2d at 810. In fact, the court said that the decorators "had no investment at all in the [ ] business, as such." *Id.* In *Carrell*, the court found the welders approximate $15,000 investment in their equipment and the costs associated with running their equipment to be consistent with independent contractor status. *Carrell*, 998 F.2d at 333–34. The court apparently compared the welders' investment with the company's investment in a construction project. *Id.* at 333.

In this case, the Plaintiffs have a substantial investment in their welding rigs. The testimony before the Court suggests that most of the Plaintiffs have approximately $30,000 invested in their welding rigs.[5] No testimony was introduced on the amount Flint has invested in the oil and gas pipeline business. However, Flint is a national corporation and has not contested Plaintiffs' assertion that Flint's investment in this business far exceeds Plaintiffs' investment. Pioneer introduced testimony suggesting that they do not have more than $80,000 invested in any one project.

■ In applying this factor the Court first rejects Pioneer's alleged $80,000 investment on a job site. Pioneer's physical equipment investment on any one job site is not close to the entire investment it has in the business. When analyzing one's investment in the business, the Court must take account of all the costs associated with the business. *See Dole*, 875 F.2d at 810 (comparing the investment of the individual cake decorators with that of the business which included advertising, phone service, utilities, water, and other employees for eight retail outlets). Pioneer has

4. Plaintiffs testified that their ability to control their costs was "minimal."

5. Plaintiff William Clarence testified that he only had approximately $5,000 invested in his equip-

ment. However, Clarence testified that his welding rig is much older than the other Plaintiffs' welding rigs.

between 60 and 150 employees working for them at any one time, and it also has overhead and administrative costs associated with running this business. Thus, both Defendants' investment in this industry dwarfs the investment of the Plaintiffs.

However, unlike the minimal investment by the employees in *Dole*, 875 F.2d at 810 ($400 a year), Plaintiffs have a significant investment in their equipment.[6] Further, between 25 and 50 percent[7] of the rig welders compensation is based on their supplying the required equipment. In fact, Plaintiffs' welding rigs must be fully operational at all times or they would receive no compensation because Plaintiffs have no other job duties other than welding, and Plaintiffs cannot weld without their welding rigs. Therefore, the Court finds that Plaintiffs' investment in this industry, and their compensation which is based on this investment, is more consistent with finding the rig welders independent contractors.

The fourth *Silk* factor focuses upon the permanence of the working relationship. The Defendants argue that Plaintiffs worked for many different companies during the year and, therefore, Plaintiffs cannot be economically dependent upon the individual Defendants as a matter of law. *Carrell*, 998 F.2d at 333. Plaintiffs argue that the fact they are transitory workers is not consistent with independent contractor status when the temporal nature of their work is due to intrinsic characteristics in the industry, rather than the rig welders exercising their own business initiative. *Superior Care*, 840 F.2d at 1061 (citing *Mr. W Fireworks*, 814 F.2d at 1053).

"Independent contractors often have fixed employment periods and transfer from place to place as particular work is offered to them, whereas "employees" usually work for only one employer and such relationship is continuous and of indefinite duration." *Dole*, 875 F.2d at 811 (citing *Donovan v. Sureway Cleaners*, 656 F.2d 1368, 1372 (9th Cir.1981)). In *Dole*, the court found the cake decorators to be permanent workers. *Id.* at 811 (finding one worker had been with the bakery for four and a half years and expected to work with the bakery indefinitely). *Carrell* distinguished *Robicheaux* in part by recognizing that the welders in *Robicheaux* had worked a substantial period of time for the alleged employer. *Carrell*, 998 F.2d at 334 (citing *Robicheaux*, 697 F.2d at 666) ("The duration of the relationship was from ten months to three years for each of [the welders]."). However, the Fifth Circuit has also held that the significance of the permanence, or lack thereof, of the employment relationship must "make allowances for those operational characteristics that are unique or intrinsic to the particular business or industry, and to the workers they employ." *Mr. W Fireworks*, 814 F.2d at 1054; *see also McLaughlin v. Seafood, Inc.*, 861 F.2d 450, 452–53 (5th Cir.), *modified by*, 867 F.2d 875 (1988).

In this case, the Plaintiffs rarely worked for either Defendant more than two months at any one time. Although many of the Plaintiffs worked for the Defendants on more than one occasion during the year, in the aggregate Plaintiffs rarely worked more than three months for either Defendant in any twelve month period.[8] It is also true that the companies who treat rig welders as em-

---

**6.** It is not clear how much Plaintiffs actually have invested in welding equipment and in the specially made beds on their pick-up trucks. Arguably, many of the Defendants' workers, employees and independent contractors alike, have reliable pick-up trucks to transport themselves to the job site each day. However, Plaintiffs did not attempt to break down the welding rigs into "business investment" and "transportation." Therefore, the Court will treat the entire $30,000 cost of these vehicles as "investment."

**7.** Pioneer President and sole stockholder Frank Santoro testified that he believed $13.50 was a fair rental value for a welding rig. Plaintiffs have claims pending in this case against seven

other Defendants that the Defendants did not pay them overtime compensation at the "regular rate" in violation of the FLSA. 29 U.S.C. § 207(a)(1) (1990). Plaintiffs have submitted evidence that $7.00 an hour is the going rental rate for welding rigs in the four corners region.

**8.** It should be noted that Plaintiffs' short duration on a job site is partly due to their standard 10 hour days and six-day work week. However, even adding 50 percent to their duration if they were to work a standard forty-hour work week would not change the fact that the Plaintiffs would still need to find employment with other companies during the year.

ployees, also do not employ the rig welders longer than two months at a time or more than three months in any twelve month period.

In *Carrell*, the court disregarded prior precedent which would have suggested that the welders transitory nature was due to intrinsic characteristics within the pipeline industry. Under the facts before the Court, it is clear the Plaintiffs worked with each Defendant until the work ran out. Rig welders, on average, remained on the job site for approximately thirty percent of its duration. There was no evidence presented that rig welders would leave the job site before they were no longer needed. The rig welders' employment was "permanent and exclusive" for the duration of the need for pipewelding, *See Secretary of Labor v. Lauritzen*, 835 F.2d 1529, 1537 (7th Cir.1987), *cert. denied*, 488 U.S. 898, 109 S.Ct. 243, 102 L.Ed.2d 232 (1988), and their transient nature "reflects the nature of their profession and not their success in marketing their skills independently." *Superior Care*, 840 F.2d at 1061. Thus, Plaintiffs' lack of permanence is due to natural characteristics in the industry, and not the independent choice usually exhibited by one who intentionally chooses to be in business for oneself. Therefore, while rig welders are temporary workers, this finding is of little relevance in determining whether these Plaintiffs are employees or independent contractors.

The Fifth *Silk* factor focuses upon the relative level of skill the Plaintiffs possessed. Defendants claim that the level of skill possessed by the rig welders is consistent with independent contractors. *Carrell*, 998 F.2d at 333. Plaintiffs do not argue that they are highly skilled, but note that this factor is of little relevance where, as here, they did not exercise their skills in any independent way. *Superior Care*, 840 F.2d at 1060.

■ While "skills are not the monopoly of independent contractors," *Lauritzen*, 835 F.2d at 1537, possessing special skills is relevant to the issue of whether workers are employees or independent contractors. *Dole*, 875 F.2d at 811. "The lack of the requirement of specialized skills is indicative of employee status." *Id.* (citing *Doty*, 733 F.2d at 723). However, many courts have rejected the finding that specialized skills is indicative of independent contractor status when those skills are not used in any independent fashion. *Martin v. Selker Brothers, Inc.*, 949 F.2d 1286, 1295 (3d Cir.1991); *Superior Care*, 840 F.2d at 1060; *see also Mr. W Fireworks*, 814 F.2d at 1053; *Usery*, 527 F.2d at 1314. In *Carrell*, the court found that the welders work required initiative because a "welder's success depended on his ability to find consistent work by moving from job to job and from company to company." *Id.* at 333.

In this case it is clear that the Plaintiffs are highly skilled individuals. In fact, it was undisputed that the Plaintiffs are the most skilled employees on a transmission systems project. This fact was one of the distinctions the court in *Carrell* relied on in departing from *Robicheaux*, where the court held "moderately skilled" welders to be employees. *Carrell*, 998 F.2d at 334 (citing *Robicheaux*, 697 F.2d at 667). However, much like the nurses in *Superior Care*, Plaintiffs' skills are not exercised in any independent manner. *Superior Care*, 840 F.2d at 1060. The Plaintiffs did not make any independent judgments on the job site. In fact, on the record before the Court, the only time a rig welder attempted to make a judgment decision he was fired. Rex Baker testified that he informed Pioneer's welding foreman Jose Aldaz that he could not properly make a particular weld because of the manner in which the pipe had been laid out. Aldaz ordered Baker to make the weld in a particular manner. When Baker persisted in his belief that the weld could not be properly done in the way Aldaz instructed him to, he was fired.

This also brings into question the importance of the fact that the Defendants supervisors were not certified welders. Although Defendants' supervisors were not certified welders, there was no evidence presented that there lack of expertise in making welds caused them to rely on the expertise of the Plaintiffs. It appears that one need not be certified in welding to be able to supervise and control the manner in which the rig welders completed their tasks. The inspec-

tors on the job site do not have to be certified welders and yet Defendants do not dispute that they exercise supervisory control over the rig welders. In fact, Clarence became an inspector only after he could no longer pass the welding test. Therefore, the fact that the Defendants did not have a certified welder to supervise the Plaintiffs is not consistent with finding that the Plaintiffs exercised any initiative or made any judgment decisions on the job site.

It is also clear from the record that the Defendants do not attempt to hire the most skilled rig welders available, nor do they negotiate pay depending upon the level of skill possessed by the individual Plaintiffs. In fact, while these welders may be highly skilled, the evidence suggests that they are not in high demand. *See McLaughlin,* 861 F.2d at 453 (focusing upon specialized *and* widely-demanded skills in determining economic independence) (emphasis added). Cahenzli testified that over 240 welders signed up for employment, yet they hired only 13 rig welders (although 20–30 is more common) in 1993. He did not state that they attempted to hire the most qualified rig welders available. Instead, Cahenzli simply called welders in the order their names appeared on Pioneer's employment sign-up list. Flint did not introduce any evidence to suggest their practice was any different, and the Plaintiffs testified this is the normal practice of all transmission systems contractors in the region. The only other method in which the Plaintiffs received employment was by driving around from job site to job site to inquire about the need for welding work. If a company needed welding work to be performed they would often hire a rig welder "off the street." This is inconsistent with the practices usually employed to hire independent contractors.

Most independent contractors develop a business relationship with many contractors based on their expertise. If they do superior work they are often sought out in the future. Part of the reason is that the contractor comes to trust their skills and depends upon their judgment in completing their tasks. Here there are no such judgment decisions expected of the rig welders and, consequently, Defendants do not discriminate between the rig welders they hire. In light of the fact that the Plaintiffs do not exercise any initiative or make any judgment decisions on the job site, the Court finds that Plaintiffs skills are not indicative of independent contractor status.

Finally, many courts, including the Tenth Circuit, have also attached some relevance to whether the workers are an integral part of the alleged employer's business. *Dole,* 875 F.2d at 811 (citing *Rutherford Food,* 331 U.S. at 726, 67 S.Ct. at 1475). Defendants' argue that because the Rig Welders are only on the job site for approximately 30 percent of each project, Plaintiffs are not integral. Plaintiffs' argue that rig welders are "a phase of the normal operations of [the transmission systems] business," *Mitchell v. John R. Cowley & Bro., Inc.,* 292 F.2d 105, 108 (5th Cir.1961), and, therefore, rig welders are an integral part of this industry.

 The integral part of the business factor focuses on whether the workers' services are a *necessary* component of the business. *Lauritzen,* 835 F.2d at 1537–38 (emphasis added); *see also Rutherford Food,* 331 U.S. at 725, 67 S.Ct. at 1474 ("The slaughterhouse operation, of which boning is a part, are carried on in a series of interdependent steps."). The rationale is that "with respect to vital or integral parts of the business, the employer will prefer to engage an employee rather than an independent contractor." *Baker v. Dataphase,* 781 F.Supp. 724, 735 (D.Utah 1992).

Rig welders are necessary in the construction of all transmission systems projects. While they do not remain on the job site from start to finish, their work is a critical step on every transmission system project. *Rutherford,* 331 U.S. at 725, 67 S.Ct. at 1474; *Lauritzen,* 835 F.2d at 1537–38. Pioneer attempts to circumvent this conclusion by stating that since they engage in business activities other than the transmission systems industry, rig welders should not be considered integral to Pioneer's business. However, it is clear from the evidence that Pioneer's home construction and remodeling projects over the last 18 months are an inconsequential portion of their business. Ca-

henzli testified that Pioneer employed between 60 and 150 workers at any one time. He also testified that in a normal year, Pioneer hired between twenty and thirty rig welders. It is doubtful that Pioneer hired even half this many carpenters to complete the four homes and two remodeling jobs they engaged in the past 18 months.

The Court does recognize that this factor, much like the skill factor mentioned above, is more relevant in proving a negative. That is, finding that rig welders are an integral part of Defendants' industry is not necessarily indicative of employee status. However, a finding that rig welders are not integral to this industry would be highly relevant in determining that the workers were independent contractors. Most independent contractors are an integral part of an employer's industry. For example, plumbing is an integral part of the home construction industry, yet this finding is of little relevance in determining whether a plumber is an independent contractor or an employee for a construction company. On the other hand, plumbing is not an integral part of the restaurant business, and therefore, this factor becomes more relevant in finding the same plumber to be an independent contractor of a restaurant for whom he provides services. Therefore, the Court finds that rig welders are an integral part of Defendants' businesses, but does not find this factor very helpful in determining the Plaintiffs' status under the FLSA.

In applying the above factors, the Court must look at the totality of the circumstances. *Dole,* 875 F.2d at 808 (citing *Rutherford Food,* 331 U.S. at 730, 67 S.Ct. at 1476). The overriding question is whether these individuals are the type of workers the FLSA intended to protect. *Castillo,* 704 F.2d at 190.

> The Fair labor Standards Act was passed by Congress to lessen, so far as seemed then practical, the distribution in commerce of goods produced under subnormal labor conditions. An effort to eliminate low wages and long hours was the method chosen to free commerce from the interferences arising from production of goods under conditions that were detrimental to the health and well being of workers.

*Rutherford Food,* 331 U.S. at 727, 67 S.Ct. at 1475. In answering this question, the Court must determine whether rig welders are economically dependent on the Defendants' businesses or whether rig welders are in business for themselves. *Dole,* 875 F.2d at 804.

In this case, Plaintiffs often work in excess of 60 hours, and work six days a week. It is not uncommon for a rig welder to work up to 12 hours in a day and in excess of 70 hours in a week. Plaintiffs' hours are unilaterally controlled by the Defendants. The Court finds this control to be consistent with finding rig welders to be employees. Arguably, this finding alone would appear to suggest that the remedial purpose of the FLSA to eliminate long hours would weigh in favor of coverage. *See Lauritzen,* 835 F.2d at 1543–44 (Easterbrook, J., concurring) (stating that the *Silk* factors should be abandoned and a test which focuses solely on the three remedial purposes of the FLSA be adopted). However, the fact the Plaintiffs have no control over their hours of work just reinforces the Court's belief, when applying *all* of the *Silk* factors, that these Plaintiffs are employees rather than independent contractors. The Defendants told the rig welders where and when to work, and they were under direct supervision on the job site by the Defendants. Plaintiffs had no ability to make a profit or a loss while working for the Defendants. Although the rig welders are highly skilled individuals, they do not use these skills in a manner consistent with being independent contractors. While they have a substantial investment in their welding rigs, Plaintiffs are not putting this investment at "risk" when they work for the Defendants. Plaintiffs' work for each Defendant is temporary, but this is due to the intrinsic characteristics in this industry rather than on account of any independence exercised by the Plaintiffs. Finally, while Plaintiffs subsistence is not dependent upon these Defendants, they do depend upon these Defendants for their continued employment in this industry. Therefore, the Court finds that the working relationship between the parties is consistent with that of employer-employee.

Wherefore;

IT IS ORDERED, ADJUDGED AND DECREED that Plaintiffs' September 1, 1993, motion for summary judgment under Count II of Plaintiffs' complaint against Pioneer Contracting Company and Flint Engineering & Construction Company be, and hereby is, granted.

IT IS FURTHER ORDERED that Defendant Pioneer Contracting Company's August 31, 1993, motion for summary judgment be, and hereby is, denied.

IT IS FURTHER ORDERED that Defendant Flint Engineering & Construction Company's September 28, 1993, motion for summary judgment be, and hereby is, denied.